# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Transport Drivers, Inc.,                                    Civil No. 16-1074 (DWF/BRT)

         Plaintiff,

v.                                                                          **MEMORANDUM**
                                                                               **OPINION AND ORDER**

Coca-Cola Refreshments USA, Inc.,

         Defendant.

---

Andrew J. Holly, Esq., Dorsey & Whitney LLP; and Lee Thomas Polk, Esq., Epstein Becker Green, P.C., counsel for Plaintiff.

Deborah A. Ellingboe, Esq., Faegre Baker Daniels LLP; and Charles Herrick Morgan, Esq., and Jonathan Gary Rose, Esq., Alston & Bird LLP, counsel for Defendant.

---

## INTRODUCTION

Plaintiff Transport Drivers, Inc. ("TDI") filed this lawsuit against Defendant Coca-Cola Refreshments USA, Inc. ("CCR") after CCR terminated the parties' business relationship and TDI became obligated to pay ERISA withdrawal liability. TDI alleges that CCR is obligated to reimburse TDI for this liability based on the terms of the parties' underlying services agreement. According to TDI, the relevant agreement is a 1985 contract entered into by the parties' predecessors and assumed by TDI in 2001. CCR, however, has introduced a 2010 agreement which it claims eliminates any obligation CCR may have had and requires TDI to indemnify CCR for the liability asserted in this

action.  CCR moves for judgment on the pleadings.  For the reasons set forth below, the Court denies CCR's motion.

## BACKGROUND

### I.      Plaintiff's Complaint

On or about November 19, 1985, predecessors of both TDI and CCR entered into a contractual agreement ("the 1985 Agreement") in which TDI's predecessor, Leaseway Personnel Corp. ("Leaseway"), agreed to provide personnel to CCR's predecessor, Coca-Cola Bottling Midwest, Inc. ("CCBM").  (Doc. No. 1 ("Compl.") ¶¶ 6-10.) Specifically, Leaseway's personnel included truck mechanics that would perform services relating to the transportation or storage of bottled beverages.  (*Id.* ¶ 6.)  A copy of the 1985 Agreement, upon information and belief, is attached to Plaintiff's Complaint and is explicitly incorporated therein.  (*Id.* ¶ 6 & Ex. A.)

In or about 1997, Logistics Personnel Corp. ("Logistics") assumed the 1985 Agreement.  (*Id.* ¶ 7 & Ex. B.)  On or about January 1, 2001, TDI succeeded Logistics and assumed the 1985 Agreement to provide services to Coca-Cola then operating under the trade name Midwest Coca-Cola Bottling Company.  (*Id.* ¶ 8.)  A copy of the letter memorializing the parties' agreement ("2001 Letter Agreement") is attached to and incorporated into the Complaint.  (*Id.* ¶ 8 & Ex. C.)[1]  TDI alleges that it provided services consistent with the 1985 Agreement from 2001 to 2013 without interruption.  (*Id.* ¶¶ 9, 16.)  TDI also alleges that CCR explicitly or by its conduct assumed the obligations of

---

[1]      Exhibit C to the Complaint includes the 2001 Letter Agreement followed by a copy of the 1985 Agreement.  Citations to the "1985 Agreement" refer to this Exhibit.

the 1985 Agreement, accepted TDI's services, and paid the invoices TDI submitted. (*Id.* ¶¶ 10-11.) TDI alleges, upon information and belief, that CCR assumed the obligations of the 1985 Agreement "as a result of a series of corporate transactions." (*Id.* ¶ 10.)

Under the terms of the 1985 Agreement, CCR agreed to lease from TDI personnel referred to in the agreement as "Workers." (*Id.* ¶ 12.) TDI was required to "pay all wages, provide all benefits, . . . and . . . negotiate and administer any collective bargaining agreements applicable to the Workers." (*Id.* ¶ 14; *see also* 1985 Agreement § 2.) TDI alleges CCR "in turn, agreed to reimburse Plaintiff for all sums it was obligated to pay for the Workers' wages and fringe benefits." (Compl. ¶¶ 15, 17; *see also* 1985 Agreement § 3 (providing obligations for invoicing and payment for charges under the agreement).) Plaintiff alleges these amounts included "amounts paid pursuant to any applicable collective bargaining agreement." (Compl. ¶ 15.) Section 4 of the 1985 Agreement provided, in relevant part:

> 4. <u>Employment Relationship</u>. . . . If any of the Workers are covered by a collective bargaining agreement, [CCR] will not violate or cause [TDI] to violate that collective bargaining agreement, and will defend, indemnify and hold [TDI] harmless against any claim, loss, expense or liability resulting from any such violation.

(*Id.* ¶ 18; 1985 Agreement § 4.) In the Complaint, TDI also points to the following clauses regarding default and modification:

> 8. <u>Default</u>. Time is of the essence and [CCR] will be in "Default" if [CCR] fails to make any required payment when due or to perform its obligation under any other provision of this Agreement, and if the failure continues for 7 or more days after written notice to [CCR]. Upon a Default, [TDI] will have the immediate right at its discretion and without further

notice, demand or hearing, all of which are expressly waived, and without prejudice to any other remedy or right provided by law, to terminate this Agreement and advise [CCR] accordingly. [TDI] may also recover all costs and expenses which it incurs in protecting its interests and enforcing its remedies under this Agreement, including reasonable legal fees.

(Compl. ¶ 21; 1985 Agreement § 8.)

> 13. <u>Modifications</u>. This document, together with its Schedule A, constitutes the complete agreement between [TDI] and [CCR], superseding any prior oral or written representations, agreements or understandings relating to this Agreement or its subject matter. For any contemporaneous or future representation, agreement, understanding or waiver to be binding upon the parties, it must be in writing signed by both parties. [TDI's] failure to strictly enforce any provision of this Agreement will not be construed as a waiver of that provision or as excusing [CCR] from future performance.

(Compl. ¶ 22; 1985 Agreement § 13.) The 1985 Agreement is governed by

Minnesota law. (*See* 1985 Agreement at 1 & § 15.)

TDI entered into collective bargaining agreements ("CBAs") with the union

representing the Workers, agreeing to make contributions to a multiemployer pension

plan—the Minneapolis Food Distributing Industry Pension Plan (the "Pension Plan")—

on the Workers' behalf. (Compl. ¶¶ 23-25; *see also id.* ¶ 23, Ex. D; *id.* ¶ 25, Ex. E.)

According to the Complaint, the Pension Plan is a multiemployer pension plan as defined

under the Employee Retirement Income Security Act of 1974, as amended. (*Id.* ¶ 34

(citing 29 U.S.C. §§ 1002(37) and 1301(a)(3)).) TDI alleges it routinely made monthly

contributions under the CBA and invoiced these contributions to CCR who paid the

invoices with knowledge of TDI's contributions to the Pension Plan. (*Id.* ¶¶ 26-27, 38.)

TDI further alleges that the parties' course of dealing at all relevant times involved such a

payment and reimbursement arrangement. (*Id.* ¶ 28.) In addition, TDI asserts CCR

advised TDI in connection with the labor negotiations regarding cost restrictions relevant to the plan contributions.  (*Id.* ¶ 29.)

On or about February 18, 2013, CCR notified TDI that it was terminating the parties' agreement effective April 1, 2013.  (*Id.* ¶ 40 & Ex. F ("Termination Letter").)  As a result of this termination, TDI effectuated a complete withdrawal from the Pension Plan and became legally obligated to pay a withdrawal liability pursuant to ERISA.  (*See id.* ¶¶ 40-43 (citing 29 U.S.C. §§ 1383(a), 1381).)  According to Plaintiff, the withdrawal liability owed "was based on, and bore a direct relationship to, the amount of periodic pension contributions made by TDI to the Pension Plan on behalf of the Workers assigned to service [CCR's] operations prior to the complete withdrawal."  (*Id.* ¶ 48 (citing 29 U.S.C. § 1381(b)); *see also id.* ¶¶ 49-50 & Ex. G.)  On or about October 3, 2014, TDI and the Pension Plan reached a settlement agreement ("Settlement Agreement") under which TDI agreed to pay $520,607 in twenty quarterly payments beginning in November 2014.  (*Id.* ¶ 51 & Ex. H.)

TDI alleges it made the required withdrawal liability payments through the date of the Complaint.  (*Id.* ¶ 52.)  In a letter dated November 13, 2015, TDI made a formal demand to CCR's representative at Coca-Cola Bottling Midwest, Inc. requesting reimbursement for the withdrawal liability, and, in January 2016, TDI began sending invoices to CCR for its withdrawal liability payments.  (*Id.* ¶ 53 & Ex. I; *id.* ¶ 54 & Ex. J.)  TDI alleges CCR has not paid any invoices, reimbursed any portion of the withdrawal liability TDI has paid, responded to the demand for reimbursement, or contacted TDI concerning this obligation.  (*Id.* ¶¶ 55, 58.)

On April 25, 2016, TDI filed a Complaint, asserting the following claims: (1) Breach of Contract (Count I); (2) Promissory Estoppel (Count II). (*Id.* ¶¶ 59-78.) Specifically, under its breach of contract claim, TDI asserts that the 1985 Agreement obligates CCR to reimburse TDI for the ERISA withdrawal liability. (*Id.* ¶ 62.) TDI frames its promissory estoppel claim as an alternative cause of action, asserting that "[i]f the Court or jury determines that there was no enforceable contract between TDI and [CCR] which [CCR] breached, TDI asserts a claim of promissory estoppel." (*Id.* ¶ 70.) Under this claim, TDI asserts that by signing the 2001 Letter Agreement, assuming the obligations of the 1985 Agreement, and thereafter reimbursing TDI for the costs relating to the Workers, CCR made a clear and definite promise to pay on which TDI reasonably relied. (*Id.* ¶¶ 71-78.)

## II.     Defendant's Answer

On July 22, 2016, CCR filed an Answer and Counterclaim. (Doc. No. 10 ("Answer").) As relevant to the present motion, CCR raises the following defenses: (1) TDI has failed to state a claim on which relief may be granted; (2) TDI's claims are barred by merger; and (3) TDI is obligated to indemnify CCR for the liability alleged in the Complaint. (*Id.* at 1-2.)

With respect to the 1985 Agreement, CCR "admits only that [it] was for the purpose of providing the services of mechanics employed by a predecessor of TDI at the Coca-Cola Bottling Midwest, Inc. location at 2750 Eagandale Boulevard, Eagan, Minnesota," but denies TDI's allegations suggesting CCR assumed the 1985 Agreement. (*Id.* ¶¶ 6, 10-11; Compl. ¶¶ 10-11.) CCR expressly "denies that it is obligated under the

1985 Agreement." (Answer ¶ 14; *see also id.* ¶¶ 17-22.) CCR also denies TDI's allegations relating to the 2001 Letter Agreement. (Answer ¶ 8; Compl. ¶ 8.)

CCR denies that it was obligated to reimburse TDI for sums to pay for the Workers' wages and benefits, including amounts paid pursuant to a CBA. (Answer ¶ 15; Compl. ¶ 15.) Specifically, CCR denies TDI's allegations relating to the Pension Plan contributions and CCR's reimbursements. (Answer ¶¶ 26-29, 38-39; Compl. ¶¶ 26-29, 38-39.) CCR admits that it notified TDI that it was cancelling its services via the February 18, 2013 Termination Letter, but denies the effect of this termination on TDI's obligation to pay a withdrawal liability. (Answer ¶ 40; Compl. ¶ 40.)

CCR admits it received a November 13, 2015 letter from TDI demanding reimbursement and that it began receiving invoices from TDI in January 2016. (Answer ¶¶ 53-54.) Further, CCR admits it has not paid any of these invoices, but specifically denies that it is obligated to do so. (*Id.* ¶ 55.) In short, "CCR denies that it has any obligation to reimburse TDI for any amount of the alleged [withdrawal liability], and further asserts that TDI is contractually obligated to indemnify CCR for any such alleged liability." (*Id.* ¶ 58.)

With respect to TDI's breach-of-contract claim, CCR denies that the 1985 Agreement is a valid and enforceable contract between the parties, denies any liability under its terms, and denies that its actions constitute a breach of contract. (Answer ¶¶ 60, 62, 65, Compl. ¶¶ 60, 62, 65.) CCR similarly denies Plaintiff's allegations under the promissory estoppel claim. (Answer ¶¶ 71-78; Compl. ¶¶ 71-78.)

## III.    Defendant's Counterclaim

CCR asserts a counterclaim for declaratory judgment, breach of contract, and promissory estoppel.  (Answer ¶ 80.)  CCR acknowledges that TDI's predecessor entered into the 1985 Agreement to provide mechanics services at the Coca-Cola Bottling Midwest, Inc. facility in Eagan, Minnesota.  (*Id.* ¶ 84.)  However, CCR alleges that on February 10, 2010, TDI's President, Ronald P. Formento, Sr. ("Formento"), entered into a new agreement on TDI's behalf entitled "Coca-Cola Enterprises Bottling Companies Services Agreement" (the "2010 Agreement").  (*Id.* ¶¶ 86, 88 & Ex. A ("2010 Agreement").)  According to CCR, the 2010 Agreement's subject matter "related to the provision of services of vehicle maintenance and repairs by TDI at the CCR affiliate location" in Eagan, Minnesota.  (*Id.* ¶ 89.)

The parties to the 2010 Agreement are identified as "Coca-Cola Enterprises Inc.,[2] its divisions, subsidiaries and affiliates ('Bottler') and Transport Drivers ('Supplier or Contractor')."  (*Id.* ¶ 86; 2010 Agreement at 1.)  In its Counterclaim, CCR explains the corporate relationship between the relevant Coca-Cola entities as follows:  "In 2010, The Coca-Cola Company acquired certain U.S. assets, agreements and liabilities of Coca-Cola Enterprises, Inc., including the facility located at 2750 Eagandale Boulevard, Eagan, Minnesota, and those assets are owned by CCR, which is a wholly-owned subsidiary of The Coca-Cola Company."  (Answer ¶ 87.)

---

[2]    The Court notes that the parties have not been consistent in referring to this entity, using both "Coca-Cola Enterprises Inc." and "Coca-Cola Enterprises, Inc."  Throughout this order, the Court will use the designation "Coca-Cola Enterprises Inc." (without a comma) to refer to this entity based on the designation used in the 2010 Agreement.

To support its Counterclaim, CCR identifies multiple relevant clauses in the 2010 Agreement. First, CCR points out the following clause regarding the effect of the agreement:

> Together, this Agreement and all Attachments shall constitute the entire agreement between the parties with regard to the subject matter hereof, shall not be modified without an agreement between the parties, and shall not be assigned in whole or in part without the written consent of the Bottler.

(Answer ¶ 90; 2010 Agreement ¶ 5.) With respect to termination, the 2010 Agreement stated:

> This Agreement shall be effective on the date of acceptance by Contractor and shall continue until all obligations under this Agreement have been performed. Bottler may terminate this Agreement during the first thirty (30) days without prior notice. Thereafter, Bottler may terminate this Agreement by giving Contractor three (3) days' written notice. In case of termination, Bottler shall have no liability to Contractor except to pay for authorized work performed by Contractor up to the date of termination and any additional work separately authorized in writing by Bottler.

(Answer ¶ 92; 2010 Agreement, Ex. A ¶ 2.) Finally, CCR identifies two relevant clauses pertaining to TDI's indemnification obligations to CCR, including the following:

> In consideration of Owner selecting Contractor to perform certain work, Contractor hereby agrees to and shall at all times defend, indemnify, release and hold Bottler and its subsidiaries, affiliates, officers, agents and employees wholly harmless from any and all losses, costs, expenses (including court costs and attorney's fees, interest and profits), claims, demands, suits by any person(s), injuries, damages or death and other liabilities of whatsoever kind or nature arising out of, resulting from, caused by, incident to, or connected with the performance of any and all work to be performed for Bottler or with respect to Bottler's property by the Contractor, any subcontractor, anyone employed by all of them or any for whose acts any of them may be liable.

(*See* Answer ¶ 95; 2010 Agreement, Ex. B, ¶ I; *see also* Answer ¶ 93; 2010 Agreement, Ex. A ¶ 4.)  The 2010 Agreement is governed by Georgia law.  (Answer ¶ 94; 2010 Agreement, Ex. A, ¶ 8.)

CCR alleges, upon information and belief, that the 2010 Agreement's terms were in effect until the February 18, 2013 termination letter by the parties' course of dealing. (Answer ¶ 96.)  In its Counterclaim, CCR asserts that upon termination, Coca-Cola Enterprises Inc. and its affiliates—including CCR—"had no liability to TDI except to pay for authorized work performed by TDI up to the date of termination and any additional work separately authorized in writing."  (*Id.* ¶ 97.)

CCR further asserts that TDI had a continuing obligation to indemnify and defend Coca-Cola Enterprises Inc. and its affiliates including CCR "from any and all losses, claims and demands arising out of, resulting from, caused by, incident to, or connected with the performance of any work by TDI under the [2010 Agreement]."  (*Id.* ¶ 98.)  This obligation, CCR argues, covers the claim for reimbursement asserted in this lawsuit, requiring TDI "to indemnify and defend, release and hold CCR wholly harmless from any and all losses, costs, [and] expenses related to this claim."  (*Id.* ¶ 99.)  On May 10, 2016, CCR informed TDI of its obligations under the 2010 Agreement, specifically its obligation to indemnify CCR for expenses incurred as a result of this lawsuit.  (*Id.* ¶ 100 & Ex. B.)  According to CCR's Counterclaim, TDI has declined to hold CCR harmless from its claims as required by the 2010 Agreement.  (*Id.* ¶ 101.)

CCR brings a Declaratory Judgment claim (Count I) seeking a declaration from the Court that the 2010 Agreement terminated the 1985 Agreement because the 2010

Agreement is completely integrated, the agreements cover the same subject matter, and the agreements are inconsistent with respect to TDI's indemnification obligations. (*See id.* ¶¶ 102-11.) CCR also brings a Breach of Contract claim (Count II), asserting that TDI has breached the 2010 Agreement by filing this lawsuit and failing to hold CCR harmless from its claim for reimbursement. (*See id.* ¶¶ 112-16.) Finally, CCR asserts a Promissory Estoppel claim (Count III) as an alternative to its breach of contract claim. (*See id.* ¶¶ 117-22.)

## IV. Plaintiff's Reply

On August 9, 2016, TDI filed an Answer to CCR's Counterclaim. (*See* Doc. No. 19 ("Pl.'s Answer").) In large part, TDI denies the allegations in CCR's Counterclaim. (*See generally id.*) However, TDI expressly admits that Formento signed the 2010 Agreement "and that the parties who were signatories to [the 2010 Agreement] were Coca-Cola Enterprises, Inc. and [TDI]." (*Id.* ¶¶ 86, 88; Answer ¶¶ 86, 88.) While admitting this fact, TDI nevertheless "denies that [the 2010 Agreement] is a proper, valid, or effective contract, or is a basis, for CCR's counterclaim." (Pl.'s Answer ¶ 86.) TDI admits that the 2010 Agreement "related to TDI's services at 2750 Eagandale Boulevard, Eagan, Minnesota." (*Id.* ¶ 89.) TDI admits that it has not indemnified CCR in any manner. (*Id.* ¶ 101; Answer ¶ 101.) "TDI denies that CCR is entitled to any relief in this action." (Pl.'s Answer ¶ 111; *see also id.* ¶¶ 102-22; Answer ¶¶ 102-22.)

TDI raises multiple defenses to CCR's Counterclaim, including failure to state a claim, estoppel, and unjust enrichment. (Pl.'s Answer at 5-6.) Most pertinent to this Order, TDI raises three defenses relating to effect of the 2010 Agreement. (*See id.* at 6.)

11

First, TDI asserts that the 2010 Agreement "is not relevant to this action." (*Id.*) Second, TDI asserts that the 2010 Agreement "did not invalidate TDI's agreement that was in force beginning in 2001 and is set forth as Exhibit C of TDI's complaint." (*Id.*) Third, TDI raises the defense that the 2010 Agreement "was not supported by consideration." (*Id.*)

## V.  Procedural Background and Additional Submissions

On September 9, 2016, CCR filed the Motion for Judgment on the Pleadings currently before the Court. (Doc. No. 20.) TDI seeks dismissal of the Complaint, arguing that TDI has failed to state a claim upon which relief can be granted. (Doc. No. 22 at 1.) On September 29, 2016, TDI filed a Memorandum in Opposition to CCR's Motion. (Doc. No. 30.) Along with this Memorandum, TDI filed two affidavits by representatives of TDI. (Doc. No. 31 ("Formento Aff."); Doc. No. 32 ("Mulvaney Aff.").)

In his affidavit, TDI's then-President Formento attests that when he signed the 2010 Agreement and sent it to Coca-Cola Enterprises Inc., "it was [his] understanding that the agreement was an administrative measure sought by [Coca-Cola Enterprises Inc.] to deal with matters such as TDI's insurance coverage." (Formento Aff. ¶¶ 3-4 & Ex. A.) Formento asserts that there was no indication or understanding that the 2010 Agreement would have any impact on the parties' 2001 contract. (*Id.* ¶¶ 5-6.) He states that he signed the 2010 Agreement to accommodate Coca-Cola Enterprises Inc.'s request relating to the "administrative matters" addressed therein. (*Id.* ¶ 7.) Finally, Formento asserts that following the execution of the 2010 Agreement, "there was no significant

12

change in TDI's operations at the Eagan, Minnesota facilities and no significant change in the financial arrangements through which TDI was compensated for its services under the primary contract in effect beginning January 2001." (*Id.* ¶ 8.)

In a separate affidavit, Dennis Mulvaney ("Mulvaney"), TDI's Regional Vice President, similarly attests to his understanding that TDI's services to CCR between 2010 and 2013 "were based on and in compliance with the agreement TDI originally entered into in January 2001, including the payments made to TDI for its services." (Mulvaney Aff. ¶¶ 1, 6.) He further asserts that CCR monitored TDI's services at the Eagan facility closely during the 2010 to 2013 time period in the same way as before 2010. (*Id.* ¶ 7.)

On October 19, 2016, CCR filed its Reply in Support of Motion for Judgment on the Pleadings. (Doc. No. 34.) On November 8, 2016, TDI filed a Motion for Leave to File Surreply, including as an attachment its Proposed Surreply. (Doc. Nos. 35, 36.) In its Proposed Surreply, TDI noted "significant questions as to the very existence of [Coca-Cola Enterprises, Inc.]," the non-party signatory to the 2010 Agreement. (Doc. No. 36 ¶¶ 4, 6-8.) Specifically, TDI's Proposed Surreply requested that the Court take judicial notice of the websites of the Secretaries of State of Delaware and Georgia which purportedly demonstrate that Coca-Cola Enterprises, Inc. was formed after the execution of the 2010 Agreement. (*See id.* ¶¶ 7-8.) The Proposed Surreply referenced two not-yet-filed exhibits apparently supporting these facts. (*See id.*)

On November 21, 2016, the Court granted TDI's Motion for Leave to File Surreply and granted CCR leave to file a responsive memorandum within fourteen days of TDI filing its Surreply. (Doc. No. 42.) TDI never formally filed its Surreply or

associated exhibits.  Nevertheless, on December 2, 2016, CCR filed a Response to Surreply along with four exhibits.  (*See* Doc. No. 43.)  In this response, CCR points the Court to exhibits attached to TDI's Complaint which purportedly demonstrate that Coca-Cola Bottling Midwest, Inc., Midwest Coca-Cola Bottling Company, Coca-Cola Enterprises Inc., and CCR are affiliates covered under the 2010 Agreement and that TDI was aware of the affiliation.[3]  (*Id.* at 2-3.)  CCR also includes as exhibits Minnesota Secretary of State records which purportedly clarify the role of Coca-Cola Enterprises Inc. in this matter.  (*See id.* at 3-4 & Exs. A-D.)  Specifically, CCR points out that the Delaware and Georgia Secretary of State records referenced in TDI's Proposed Surreply incorrectly relate to Coca-Cola Enterprises, Inc.  (*Id.* at 3.)  According to CCR, "[t]he correct entity that is the signatory to the [2010 Agreement] is Coca-Cola Enterprises Inc. (no comma)."  (*Id.*)  As to this entity, CCR explains, Minnesota Secretary of State records show the formation of the company prior to the 2010 Agreement and the affiliation to CCR.  (*Id.*)  In short, CCR asserts that "[t]hese documents show that there is no connection between CCR and Midwest Coca-Cola Bottling Company except through [Coca-Cola Enterprises Inc.]."  (*Id.* at 3-4.)

---

[3]     Specifically, CCR points to three documents:  (1) a 2001 purchase order form showing Coca-Cola Enterprises Inc.'s purchase of the 1985 Agreement (*see* Compl. ¶ 8, Ex. C); (2) the February 2013 Termination Letter from CCR (*see* Compl. ¶ 40, Ex. F); and (3) an April 2013 letter from TDI to Coca-Cola Enterprises Inc. referencing "Coca Cola Enterprises, Inc.'s recent cancelation of the agreement between our companies" (*see* Compl. ¶ 53, Ex. I).  (Doc. No. 43 at 2-3.)

**DISCUSSION**

**I.      Legal Standard**

A party may move for judgment on the pleadings at any point after the close of the

pleadings, so long as it moves early enough to avoid a delay of trial.  Fed. R. Civ.

P. 12(c).  "Judgment on the pleadings is appropriate only when there is no dispute as to

any material facts and the moving party is entitled to judgment as a matter of law[.]"  *See*

*Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v.*

*Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).  The Court evaluates a motion for judgment

on the pleadings under the same standard as a motion brought under Federal Rule of Civil

Procedure 12(b)(6).  *See id.*

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in

the complaint to be true and construes all reasonable inferences from those facts in the

light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th

Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory

allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th

Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v.*

*City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  Although a complaint need not contain "detailed factual allegations," it must

contain facts with enough specificity "to raise a right to relief above the speculative

level."  *Id*. at 555.  As the Supreme Court reiterated, "[t]hreadbare recitals of the elements

15

of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.    The Parties' Submissions

As explained above, numerous submissions in addition to TDI's Complaint and CCR's Answer and Counterclaim have been presented to the Court. As a threshold matter, therefore, the Court must clarify which submissions it will consider at this stage to evaluate CCR's Rule 12(c) Motion for Judgment on the Pleadings.

First, and of central importance, CCR submitted the 2010 Agreement as an attachment to its Answer and Counterclaim. CCR argues that the Court can properly consider the 2010 Agreement because it is a relevant document that TDI failed to mention or produce along with the Complaint. CCR argues that the 2010 Agreement is necessarily embraced by the Complaint because it terminates the 1985 Agreement upon which the Complaint is based.

Second, TDI has introduced two affidavits of its representatives. TDI argues that the Court should consider its representatives' affidavits and attached correspondence because these materials are embraced by CCR's counterclaim. According to TDI, these affidavits establish that the parties' business relationship continued in the same manner following the 2010 Agreement. TDI points out that CCR's motion must be treated as a motion for summary judgment if the Court considers any matters outside of the pleadings and indicates that it has presented its representatives' affidavits to rebut CCR's motion

because discovery has yet to be conducted at this early stage. CCR submits that the Court need not consider TDI's affidavits because the 2010 Agreement is unambiguous.

Finally, TDI and CCR have directed the Court to corporate records maintained by the Secretaries of State of Georgia, Delaware, and Minnesota relating to various Coca-Cola entities. Both parties suggest that the Court may properly take judicial notice of such records.

On a Rule 12(c) motion for judgment on the pleadings, the court must convert the motion to a Rule 56 motion for summary judgment if the Court considers "matters outside the pleadings." Fed. R. Civ. P 12(d). However, a court deciding a motion for judgment on the pleadings may properly consider the pleadings, certain matters of public record, and "materials that are 'necessarily embraced by the pleadings.'" *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citation omitted). Written instruments attached as exhibits to a pleading are treated as "a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Chancellor v. State Farm Mut. Auto Ins. Co.*, Civ. No. 08-6065, 2008 WL 4368670, at *2 (W.D. Ark. Sept. 22, 2008).

Courts are split over whether it is proper to consider exhibits attached to the answer in evaluating a Rule 12(c) motion where those documents are "not referenced in or attached to the complaint." 5C Charles Alan Wright et al., *Federal Practice and Procedure* § 1371 (3d ed. 2017 Update). However, lower courts in this Circuit and the Eighth Circuit appear willing to consider exhibits attached to the answer under certain circumstances. *See Sinclair Refining Co. v. Stevens*, 123 F.2d 186, 188-89 (8th Cir. 1941) (considering agreements attached to the answer where the date of the agreements

was referenced in plaintiff's pleading and "[i]n their reply the plaintiffs admitted the execution of the documents included in defendant's answer"); *see also Chancellor*, 2008 WL 4368670, at *2 (evaluating an insurance policy referenced in the plaintiff's complaint and attached to the defendant's answer). In particular, written instruments such as a contract may properly be considered where they are attached to the pleadings. *See Luther v. Am. Nat'l Bank of Minn.*, Civ. No. 13-184, 2013 WL 12073798, at *4 (D. Minn. Aug. 21, 2013) ("[O]n a motion for Rule 12(c) judgment on the pleadings, the Court 'may review not only the complaint but also the answer and written instruments attached to the pleadings.'" (quoting *Huggins v. Zaloga*, 2013 WL 1330812, at *2 (M.D. Pa. Mar. 29, 2013))), *aff'd*, 563 F. App'x 503 (8th Cir. 2014).

Here, the Court will consider the 2010 Agreement which is attached as an exhibit to CCR's Answer and Counterclaim. Importantly, TDI does not dispute the authenticity of the 2010 Agreement and admits that the document was executed by TDI's President.[4] The Court, however, declines to consider the affidavits submitted by TDI at this stage because they are neither necessarily embraced by the pleadings nor attached to the pleadings as exhibits. Further, unlike the 2010 Agreement, these affidavits are not written instruments whose authenticity is unquestioned by the parties. Finally, the Court will consider the Secretary of State records referenced by the parties as they are matters of public record of which the Court may properly take judicial notice.

---

[4] Indeed, in its briefing, TDI does not directly challenge the Court's consideration of the 2010 Agreement. Rather, Plaintiff introduces its own evidence in the form of two affidavits to rebut the *significance* of the 2010 Agreement.

## III.    Breach of Contract

CCR argues it is entitled to judgment on the pleadings with respect to TDI's breach-of-contract claim because the 2010 Agreement governs the dispute, and TDI thus fails to state a claim based on the 1985 Agreement.  According to CCR, the 2010 Agreement was supported by adequate consideration and plainly agreed to by TDI's President.  Further, CCR argues that both agreements indisputably cover the same subject matter.  In particular, CCR points to a clause in the 2010 Agreement providing the following description of services:  "Contractor shall provide to the Bottler the following services and related equipment at the following location:  EAGAN Vehicle maintenance & repairs."  (2010 Services Agreement ¶ 1.)  These services, CCR argues, are exactly the same as those covered by the 1985 Agreement.  CCR also points out that the 2010 Agreement contains a quote establishing the rate for services including wages consistent with the CBA and fringe benefits.  CCR contends that the unambiguous merger clause in the 2010 Agreement indicates that it represented the parties' entire agreement and terminated the 1985 Agreement.  CCR points out that TDI has not argued that the 2010 Agreement is ambiguous or that the parties had any separate oral agreements.  CCR argues that whether the 2010 Agreement is an integrated agreement is a question of law that the Court can properly consider at this stage and submits that no material facts remain in dispute.  CCR also argues that the two agreements cannot be read together and that the 2010 Agreement expressly requires TDI to indemnify CCR for the liability asserted in this case.

TDI, on the other hand, argues that it has adequately stated a claim for breach of contract. According to TDI, the 2010 Agreement covered a different scope from the 1985 Agreement. In particular, TDI points out that the 2010 Agreement is limited "to the subject matter hereof," including certain administrative matters not relevant to CCR's Pension Plan reimbursement responsibility. TDI suggests that parol evidence can properly be considered to determine whether the 2010 Agreement was a complete integration. In any event, TDI argues, numerous material facts remain in dispute surrounding the significance of the 2010 Agreement, making judgment improper prior to discovery. In particular, TDI asserts that whether the 2010 Agreement subsumed the 1985 Agreement is disputed. TDI also argues that CCR has not adequately alleged facts to demonstrate that the 2010 Agreement is valid, enforceable, or supported by consideration. Finally, TDI notes the lack of clarity surrounding the business relationships between TDI, CCR, and Coca-Cola Enterprises Inc. to further support that material facts are disputed.

The 1985 Agreement is governed by Minnesota law, and the 2010 Agreement is governed by Georgia law. Because TDI's breach of contract claim is premised on CCR's alleged breach of the 1985 Agreement, the Court will apply Minnesota law to evaluate whether TDI has adequately stated a breach of contract claim. However, TDI's argument that the 2010 Agreement superseded and terminated the 1985 Agreement requires the

Court to evaluate the effect of the later agreement.  Thus, the Court will apply Georgia law to evaluate the 2010 Agreement and its effect on TDI's breach of contract claim.[5]

Under Minnesota law, a breach of contract claim requires a plaintiff to establish the following elements:  "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."  *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).  "Unambiguous contract language must be given its plain and ordinary meaning."  *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn. 2009).  However, where the liability determination involves "a fact intensive inquiry," a court may properly decline the invitation to dismiss a claim "as a matter of law based on a plain reading of the Agreement."  *See Covanta Hennepin Energy Resource Co., LLC v. Cty. of Hennepin*, Civ. No. 16-3086, 2016 WL 7155737, at *3 (D. Minn. Dec. 7, 2016) ("As evidenced by the Agreement and related documents provided to the court, the question of whether [defendant] breached the Agreement is a fact intensive inquiry that cannot be resolved on a motion to dismiss.").

Under Georgia law, "[t]he construction of a contract is a question of law for the court."  Ga. Code Ann. § 13-2-1 (2016).  When interpreting a contract, "[t]he first step is to look to the four corners of the instrument to determine the intention of the parties from the language employed."  *Livoti v. Aycock*, 590 S.E.2d 159, 164 (Ga. Ct. App. 2003).  In conducting this step, "all the attendant and surrounding circumstances may be proved but

---

[5]    The parties have not squarely addressed the choice-of-law question and cite to both Minnesota and Georgia law in their briefing.

not explained." *See id.*; *see also* Ga. Code Ann. § 13-2-2(1) (2016).  Under the parol

evidence rule, "a valid, written contract which is complete, and the terms of which are not

ambiguous, can not be contradicted, added to, altered, or varied by parol agreements."

*S & S Builders, Inc. v. Equitable Inv. Corp.*, 134 S.E.2d 777, 780 (Ga. 1964).  To apply

this rule, a court may consider whether the agreement contains any "incompleteness or

ambiguity as to the scope of the contractual obligation entered into by the parties."  *Id.* at

782.

A corollary to the parol evidence rule is the "merger rule" which Georgia courts

articulate as follows:  "The rational basis for the merger rule is that where the parties

enter into a final contract all prior negotiations, understandings, and agreements 'on the

same subject' are merged into the final contract and are accordingly extinguished."

*Wallace v. Bock*, 620 S.E.2d 820, 822 (Ga. 2005) (quoting *Health Serv. Ctrs. v. Boddy*,

359 S.E.2d 659, 661 (Ga. 1987)).  Ultimately, whether to apply the merger rule depends

on the parties' intent.  *Arnold v. Arnold*, 489 S.E.2d 65, 67 (Ga. Ct. App. 1997).  The

language of a merger clause within the contract is a relevant consideration.  *See Atlanta

Integrity Mortg., Inc. v. Ben Hill United Methodist Church, Inc.*, 650 S.E.2d 359, 362

(Ga. Ct. App. 2007).[6]

---

[6]     The parties both cite to the Restatement (Second) of Contracts § 209 which
discusses "integrated agreements" or "writings constituting a final expression of one or
more terms of an agreement."  Restatement (Second) of Contracts § 209(1).  Because the
Court has not located any cases under Georgia law adopting this portion of the
Restatement, the Court will instead rely on Georgia's enunciation of similar principles
under the "merger rule."  *See generally* John K. Larkins, Jr., *Georgia Contracts: Law and*

(Footnote Continued on Next Page)

Notwithstanding the presence of a merger clause in a subsequent agreement, however, an existing contract will not merge where the agreements constitute "separate contracts dealing with essentially different subject matters." *Bowen v. Budd*, 297 S.E.2d 334, 336 (Ga. Ct. App. 1982). Indeed, where a case involves "two separate and distinct written contracts entered into by the same parties, but at different times," a party seeking to establish contractual merger must demonstrate "more than a similarity of subject matter." *Wallace*, 620 S.E.2d at 822. As the Georgia Supreme Court has explained, "[a]n existing contract is superseded and discharged whenever the parties subsequently enter upon *a valid and inconsistent agreement completely covering the subject-matter embraced by the original contract.*" *Id.* (quoting *Hennessy v. Woodruff*, 82 S.E.2d 859, 861 (Ga. 1954)). Relying on the Second Restatement, the court explained that "[s]uch a 'substituted contract discharges the original duty and [a] breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.'" *Id.* (quoting Restatement (Second) of Contracts § 279(2)).

Importantly, a merger clause may only be relied upon to override a prior contractual arrangement if the contracts involve the same parties. *See Noorani C-Stores, Inc. v. Trico V Petroleum, Inc.*, 637 S.E.2d 208, 212 (Ga. Ct. App. 2006) (explaining that no explanation supported the trial court's conclusion that "one corporation can rely on a merger clause in a contract entered into by another corporation"); *see also Atlanta*

---

(Footnote Continued From Previous Page)
*Litigation* § 3:8 (2d ed. Oct. 2016 Update) (treatise section on Georgia law relating to "Merger (integration) and merger clauses").

*Integrity Mortg., Inc.*, 650 S.E.2d at 362 ("In order for the merger rule to apply, . . . the parties of the merging contracts must be the same and the terms of those contracts must completely cover the same subject matter and be inconsistent."). Extrinsic evidence that does not alter a contract's terms may be relied upon "to show for whose benefit the contract was made or the real party at interest." *Powell v. Ferguson Tile & Terrazzo Co.*, 188 S.E.2d 901, 904 (Ga. Ct. App. 1972).

The essential components of a valid contract under Georgia law include "parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." Ga. Code Ann. § 13-3-1 (2016). A mutual exchange of promises is sufficient to establish that a contract is supported by consideration. Ga. Code Ann § 13-3-42 (2016). However, "[a]n agreement on the part of one to do what he is already legally bound to do is not a sufficient consideration for the promise of another." *Stefano Arts v. Sui*, 690 S.E.2d 197, 201 (Ga. Ct. App. 2010) (quoting *Lamb v. Fulton–DeKalb Hosp. Auth.*, 677 S.E.2d 328, 333 (2009)). In addition, "the consideration must be stated in the contract or at least be ascertainable from the contract." *Tafel v. Lion Antique Invs. & Consulting Servs.*, Civ. No. 1:10-CV-3260-TWT, 2011 WL 3846522, at *2 (N.D. Ga. Aug. 29, 2011) (quoting *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 1001 (N.D. Ga. 1992)), *aff'd*, 459 F. App'x 847 (11th Cir. 2012).

The Court concludes that judgment in CCR's favor is premature at this stage. Notwithstanding the 2010 Agreement, CCR has failed to demonstrate that "there is no dispute as to any material facts" or that it is "entitled to judgment as a matter of law[.]"

*See Ashley Cty.*, 552 F.3d at 665. CCR's argument that the 2010 Agreement terminated the 1985 Agreement and precludes TDI's breach of contract claim depends on the effect of the following merger clause:

> Together, this Agreement and all Attachments shall constitute the entire agreement between the parties with regard to the subject matter hereof, shall not be modified without an agreement between the parties, and shall not be assigned in whole or in part without the written consent of the Bottler.

(Answer ¶ 90; 2010 Agreement ¶ 5.) The parties to the 2010 Agreement are identified as TDI and "Coca-Cola Enterprises Inc., its divisions, subsidiaries and affiliates." (2010 Agreement at 1.) With respect to consideration, the 2010 Agreement states that it was entered into "[f]or good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto." (*Id.*) The indemnification agreement attached as Exhibit B to the 2010 Agreement also indicates that it is entered into "[i]n consideration of Owner selecting Contractor to perform certain work." (*See id.* at Ex. B, ¶ I.)

Crucially, the parties dispute what "the subject matter hereof" extends to in the 2010 Agreement. This dispute is material because the 2010 Agreement may well be construed to terminate the 1985 Agreement by merger if the agreements cover the same scope. *See Wallace*, 620 S.E.2d at 822. However, the Court declines at this stage to hold that the 1985 Agreement and the 2010 Agreement unambiguously cover the same subject matter, particularly with respect to the withdrawal liability claimed by TDI. Based on the pleadings alone, numerous uncertainties exist regarding the execution of the 2010 Agreement, the intended scope of the Agreement, and the parties thereto.

25

CCR claims that the corporate relationships among the relevant Coca-Cola entities are plainly apparent based on the existing record. Construing the record in the light most favorable to TDI, however, the Court finds that the identities of the real parties in interest to the competing agreements are uncertain.[7] CCR also argues that the consideration for the 2010 Agreement is established on the face of the agreement based on the mutual exchange of promises to provide services and compensation in return. TDI, however, alleges that the 2010 Agreement was not supported by consideration. Further, it is not plain from the agreement that TDI promised to engage in any services beyond what it was already bound to perform. As a result, the Court concludes that CCR has failed to establish that it is entitled to judgment as a matter of law at this stage.

---

[7]     The 2001 Letter Agreement whereby TDI assumed the 1985 Agreement identifies Coca Cola Bottling Midwest, Inc. as the signatory Coca-Cola entity. (2001 Letter Agreement.) An attachment to this agreement is a purchase order for the Personnel Lease Agreement identifying Coca-Cola Enterprises Inc. and Midwest Coca-Cola Bottling Company. (*Id.*) The 2010 Agreement identifies the relevant Coca-Cola parties as "Coca-Cola Enterprises Inc., its divisions, subsidiaries and affiliates." (2010 Agreement at 1.) The 2013 Termination Letter was sent to TDI by Coca-Cola Refreshments. (Termination Letter.)

Minnesota Secretary of State records indicate that Coca-Cola Enterprises Inc. operated under the assumed name of Midwest Coca-Cola Bottling Company as of September 1995. (*See* Doc. No. 43-1.) These records also indicate that Coca-Cola Enterprises Inc. operated under the name Coca-Cola Refreshments USA, Inc. by October 2010. (*See* Doc. Nos. 43-2; 43-4.)

In light of these documents, the Court notes that it is likely the 2010 Agreement implicated the relevant Coca-Cola entities at issue here, including CCR. However, TDI has raised questions regarding the 2010 Agreement's validity and the authority of Coca-Cola Enterprises Inc. to terminate the existing agreement. Because this case is at the pleading stage, and in light of the atypical procedural manner in which the various relevant submissions have been presented to the Court, the Court concludes that TDI has sufficiently raised disputes that merit further discovery regarding the nature of the corporate relationships at issue in this case.

At the same time, the Court expressly declines to hold that either of the agreements is ambiguous in any material respects. It may well be that the parties' claims are easily resolved at summary judgment as the attendant circumstances surrounding the agreements and the relationships among the relevant entities become clearer through discovery. To be sure, an unambiguous contract must be interpreted by the Court as a matter of law. However, the Court concludes that permitting discovery in this case will aid the Court in resolving the questions raised by the parties' competing agreements. *Cf. Chancellor*, 2008 WL 4368670, at *3 ("The proper construction and interpretation of the insurance contract in question—while a matter of law—has not been fully evaluated by the parties. Accordingly, the Court declines to resolve the interpretive conflict at this time." (citation omitted)).

Assuming the facts alleged in the Complaint to be true and construing all reasonable inferences in TDI's favor, TDI has plausibly alleged a claim for breach of contract against CCR relating to the Pension Plan withdrawal liability. Specifically, TDI alleges that the parties had an existing contract—the 1985 Agreement—that obligated CCR to reimburse TDI for its Workers' wages and fringe benefits and to indemnify TDI for liability resulting from violations of any applicable CBAs. TDI alleges that it has performed its obligations under the 1985 Agreement and plausibly alleges that CCR has breached the 1985 Agreement by failing to reimburse TDI for the ERISA withdrawal liability incurred following CCR's termination of the parties' business relationship. Thus, the Court denies CCR's motion on TDI's breach of contract claim.

**IV.     Promissory Estoppel**

CCR argues that TDI has failed to state a claim for promissory estoppel because TDI's claim is premised on the 1985 Agreement which was terminated by the 2010 Agreement.  TDI notes the established rule that promissory estoppel can only apply where a contract does not exist.  Separately, CCR argues that TDI fails to state a claim as a matter of law because TDI cannot establish the essential elements of a promissory estoppel claim.  Specifically, CCR argues that TDI has failed to allege facts to support that CCR made a clear and definite promise to indemnify TDI for the ERISA withdrawal liability in question.  In particular, CCR argues that the alleged clear and definite promise is premised on the 1985 Agreement which has been superseded.  And even if TDI was operating under the mistaken belief that it was performing under the 1985 Agreement, CCR argues that it made no clear and definite promise to pay the withdrawal liability.  Specifically, CCR contends that the history of business practices between the parties could not support a clear and definite promise because the issue of withdrawal liability had never before arisen.  CCR also argues that reliance on the alleged promise under the superseded 1985 Agreement is unreasonable as a matter of law.  Finally, CCR argues that TDI's promissory estoppel claim is precluded by the 2010 Agreement which expressly establishes that TDI is obligated to indemnify CCR for any and all withdrawal liability.

TDI, on the other hand, argues that it has adequately alleged all three elements of a promissory estoppel claim.  TDI relies on the 1985 Agreement to support that CCR made a clear and definite promise to provide compensation under the terms of the agreement. TDI suggests that CCR's position that the 2010 Agreement terminated the 1985

Agreement creates fact issues under TDI's promissory estoppel claim. Specifically, TDI contends that if CCR is correct that the 2010 Agreement superseded the 1985 Agreement, there was no contract governing compensation from 2010 until the termination of the business relationship in 2013. During this period of time, TDI alleges that it continued its performance under the belief that the 1985 Agreement continued, and CCR continued compensating TDI for such services. TDI alleges it was reasonable to rely on the promise under the original agreement because TDI was not put on notice that the 1985 Agreement had been terminated. These actions, TDI suggests, plausibly support TDI's alternative claim for promissory estoppel should the Court determine that the 1985 Agreement does not govern CCR's obligations. TDI also argues that the alleged promise must be enforced to prevent the injustice of CCR's attempt to avoid liability. TDI emphasizes that its promissory estoppel claim is asserted in the alternative and that it does not seek to recover under both counts in the Complaint.

"Promissory estoppel is a creature of equity which implies 'a contract in law where none exist in fact.'" *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn. 1995) (quoting *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981)). Where there is "no factual dispute that the parties entered into a valid written contract," the existence of such a contract precludes a promissory estoppel claim as a matter of law. *See Afremov v. Jarayan*, 2012 WL 1049739, at *5 & n.5 (D. Minn. Mar. 28, 2012); *see also Myrlie v. Countrywide Bank*, 775 F. Supp. 2d 1100, 1107 (D. Minn. 2011) ("[A]n express contract covering the same subject matter will preclude the application of promissory estoppel." (quoting *Greuling v. Wells Fargo Home Mortg.*,

*Inc.*, 690 N.W.2d 757, 761 (Minn. Ct. App. 2005))). However, a Plaintiff may validly

assert both a breach of contract claim and a promissory estoppel claim in the alternative.

*See Toomey v. Dahl*, 63 F. Supp. 3d 982, 998-99 (D. Minn. 2014) ("Promissory estoppel

can provide an equitable fall back when the law prevents a plaintiff from prevailing on a

breach of contract claim."); *see also Krutchen v. Zayo Bandwidth Northeast, LLC*,

591 F. Supp. 2d 1002, 1018 (D. Minn. 2008) ("As [plaintiff's] promissory estoppel claim

is duplicative of his breach of contract claim, only one may ultimately proceed.").

"To state a claim for promissory estoppel, the plaintiff must show that (1) there

was a clear and definite promise, (2) the promisor intended to induce reliance and such

reliance occurred, and (3) the promise must be enforced to prevent injustice." *Park

Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 834 (Minn. 2011); *see also Cohen v. Cowles

Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992) ("Under promissory estoppel, a promise

which is expected to induce definite action by the promisee, and does induce the action,

is binding if injustice can be avoided only by enforcing the promise."). The first element

requires "that the promisor should reasonably expect to induce action or forbearance on

the part of the promisee." *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746

(Minn. 2000); *see also* Restatement (Second) of Contracts § 90(1). With respect to the

second element, the plaintiff's reliance on the alleged promise must be reasonable. *See

Barker v. Cty. of Lyon*, 813 N.W.2d 424, 426 (Minn. Ct. App. 2012). Reliance may be

deemed unreasonable as a matter of law where a written contract directly contradicts the

claimed representation. *BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 903

(Minn. Ct. App. 2010).

The Court concludes that TDI's promissory estoppel claim should proceed. At this stage, TDI has adequately pled the elements of a promissory estoppel claim based on CCR's assumption of the obligations under the 1985 Agreement and subsequent conduct in reimbursing TDI for the Workers' pension benefits. The terms of the 1985 Agreement constitute a promise that is sufficiently clear and definite that CCR would have reasonably expected to induce TDI to continue performing services. Specifically, the 1985 Agreement's provisions relating to the Workers' wages and benefits, CCR's reimbursement obligations, and indemnification obligations for claims relating to the Workers' CBAs can plausibly be construed as a promise to reimburse TDI for the Workers' benefits, including the Pension Plan withdrawal liability at issue in this case.

To be sure, TDI may not simultaneously prevail on a breach of contract claim and a promissory estoppel claim based on the 1985 Agreement and "only one may ultimately proceed." *See Krutchen*, 591 F. Supp. 2d at 1018. Similarly, if the Court concludes that the 2010 Agreement superseded the 1985 Agreement and governs this dispute, TDI may have difficulty prevailing on a promissory estoppel theory. As CCR notes, if the 1985 Agreement was superseded, any reliance thereon may be deemed unreasonable as a matter of law. However, the validity of the 2010 Agreement is disputed, and TDI contests the significance of the later agreement with respect to the liability asserted against CCR. For the reasons discussed above with respect to TDI's breach of contract claim, the Court declines to conclude at this stage that the 2010 Agreement superseded the 1985 Agreement. Therefore, the Court will permit TDI's promissory estoppel claim to proceed.

## CONCLUSION

Construing the record in the light most favorable to TDI, TDI has pled plausible claims for breach of contract and promissory estoppel in the alternative based on the terms of the 1985 Agreement. In its Answer and Counterclaim, CCR has identified a more recent agreement—the 2010 Agreement—that could ultimately dispose of TDI's claims and result instead in a judgment in CCR's favor. Because the parties dispute the significance of the 2010 Agreement and its validity, however, the Court concludes that granting judgment in CCR's favor would be premature.

As this matter proceeds, the Court is hopeful that discovery will lead to greater clarity over the relevance of these competing agreements and the nature of the business relationships between TDI and the relevant Coca-Cola entities. For these corporate entities seeking to govern their business affairs by contract, it seems clear that this case will likely be resolved by an interpretation of contractual terms to which the parties mutually agreed. Going forward, therefore, the parties will have the obligation to clearly persuade the Court regarding which contract governs this dispute and whether the terms of that contract support a judgment in their favor. Because the answers to these critical questions remain unclear at this stage, CCR's Motion for Judgment on the Pleadings is denied.

**ORDER**

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED**
that:

1.     Defendant's Motion for Judgment on the Pleadings (Doc. No. [20]) is

**DENIED**.


Dated:  May 10, 2017                          s/Donovan W. Frank
                                              DONOVAN W. FRANK
                                              United States District Judge