# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Transport Drivers, Inc.,

Civil No. 16-1074 (DWF/BRT)

          Plaintiff,

v.

**MEMORANDUM**
**OPINION AND ORDER**

Coca-Cola Refreshments USA, Inc.,

          Defendant.

_____

Andrew J. Holly, Esq., Kirsten E. Schubert, Esq., and Tiana Towns, Esq., Dorsey & Whitney LLP; and Lee Thomas Polk, Esq., Epstein Becker Green, P.C., counsel for Plaintiff.

Deborah A. Ellingboe, Esq., Faegre Baker Daniels LLP; and Charles Herrick Morgan, Esq., and Jonathan Gary Rose, Esq., Alston & Bird LLP, counsel for Defendant.
_____


# INTRODUCTION

This matter is before the Court on a Motion for Partial Summary Judgment filed by Plaintiff Transport Drivers, Inc. ("TDI"). (Doc. No. 82.) Also pending is a Motion for Summary Judgment filed by Defendant Coca-Cola Refreshments USA, Inc. ("CCR"). (Doc. No. 88.) TDI seeks reimbursement from CCR of more than $500,000 in withdrawal liability assessed pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). This liability arose from TDI's withdrawal from a multiemployer pension plan following CCR's termination of the parties' labor services leasing arrangement. CCR denies that it has any obligation to pay

and argues that TDI must indemnify CCR for the claims TDI asserts in this lawsuit.  For the reasons set forth below, the parties' motions are both granted in part.

## BACKGROUND

### I.     The Parties

TDI provides labor leasing services throughout the United States.  (*See* Doc. No. 99 ("CCR Index") at 1, Ex. 5 ("R. Formento Dep.") at 6-7; CCR Index at 2, Ex. 7 ("J. Formento Dep.") at 49; CCR Index at 3, Ex. 22 ("TDI Website").)  TDI employs laborers who perform work for TDI's customers, and TDI provides services to its customers relating to labor negotiations, payroll, and employee benefits.  (R. Formento Dep. at 14-15; TDI Website.)  Ronald Formento was TDI's President from 1976 until 2013.  (R. Formento Dep. at 6.)  Jonathan Formento became President thereafter.  (J. Formento Dep. at 32.)  During his tenure with the company, Ronald Formento negotiated more than five hundred business agreements.  (R. Formento Dep. at 8-9.)  Based on his professional experiences, Ronald Formento was familiar with withdrawal liability that may arise from collective bargaining agreements; he testified that he was "more attuned to withdrawal liability than a lot of other people."  (*Id.* at 18-22, 34, 40-41.)

CCR is a subsidiary of The Coca-Cola Company, and the corporate successor of Coca-Cola Bottling Midwest, Inc. ("CCBM") and Coca-Cola Enterprises Inc. ("CCE"). (Doc. No. 97 ("Manning Decl.") ¶¶ 3-4, 6-9, Exs. A-E.)  According to the Associate General Counsel of The Coca-Cola Company, "CCR is the successor in interest to

(1) contracts entered into by and property of the former entity [CCBM]; and (2) contracts entered into by and property of the former entity [CCE]."[1]  (Manning Decl. ¶¶ 3, 5.)

## II.     The 2000 Agreement and the Parties' Ongoing Business Relationship

On December 28, 2000, TDI reached out to CCBM, proposing that TDI adopt as written an existing labor services contract between CCBM and a company that was going out of business.  (Doc. No. 86 ("R. Formento Aff.") ¶ 11, Ex. A ("2000 Agreement").) CCBM accepted TDI's proposal.  (*Id.*)  The 2000 Agreement consisted of a letter with an attached agreement entered into between a predecessor leasing company and CCBM in 1985.  (*See id.*)  TDI did not seek attorney consultation to negotiate the 2000 Agreement based on timing concerns.  (R. Formento Dep. at 56-59.)

The 2000 Agreement contains the following relevant provisions:

> 1.      Lease of Personnel.  [CCR] agrees to lease from [TDI] drivers or other personnel ("Workers") as needed by [CCR] in connection with the transportation or storage of goods, upon the terms and conditions set forth in this Agreement and in the Schedules A.  Each Schedule A will become part of and subject to this Agreement upon execution by both parties.
> 2.      Services Provided by [TDI].  [TDI] agrees to provide the following services to [CCR]: . . .
> (b)      Wages and Benefits.  [TDI] will pay all wages, provide all benefits, pay all federal and state wage taxes . . . and maintain payroll records for the Workers.
> (c)      Collective Bargaining Agreements.  [TDI] will negotiate and administer any collective bargaining agreements applicable to the Workers.
> 3.      Payments.  [TDI] will invoice [CCR] each week for all charges payable for that week as described in the Schedules A, and for all other charges provided for in this Agreement. . . .
> 4.      Employment Relationship.  . . . If any of the Workers are covered by a collective bargaining agreement, [CCR] will not violate or

---

[1]      In light of the corporate relationships among the relevant Coca-Cola entities, the Court will discuss CCBM and CCE's obligations as CCR's throughout this order.

cause [TDI] to violate that collective bargaining agreement, and will defend, indemnify and hold [TDI] harmless against any claim, loss, expense or liability resulting from any such violation.

    5.    <u>Regulations</u>. [CCR] assumes responsibility for compliance by the Workers with U.S. Department of Transportation Hours of Service and other applicable federal and state governmental regulations (including those related to environmental impairment), and will defend, indemnify and hold [TDI] harmless against any claim, loss, expense, fine or penalty resulting from any violation of these regulations. . . .

    6.    <u>Insurance and Indemnification</u>. . . .

    (e)    <u>Indemnification</u>. . . . [CCR] agrees to release, indemnify, defend and hold harmless [TDI], its officers, employees (including the Workers), agents, affiliates and insurers, against all claims, liabilities, losses, legal fees and other expenses . . . for personal injuries or death and for loss or damage . . . to the vehicles, cargo, real estate or other property of any person (including [TDI], [CCR] and their respective officers, employees and agents), except to the extent of recovery under any insurance policy provided by [TDI] or [CCR] under this Agreement, arising out of (i) ownership, maintenance, operation or use, including loading and unloading, of vehicles operated or maintained by the Workers, whether resulting from the sole negligence of [TDI] or a Worker, or otherwise, (ii) services performed by the Workers under this Agreement, (iii) the conduct of [CCR]'s business, and (iv) [CCR]'s failure to comply with the provisions of this Paragraph 6 and of any insurance policy provided under this Paragraph 6.

    7.    <u>Termination</u>. Either party may terminate this Agreement in its entirety upon at least 30 days prior written notice to the other party.

    8.    <u>Default</u>. . . . [TDI] may also recover all costs and expenses which it incurs in protecting its interests and enforcing its remedies under this Agreement, including reasonable legal fees.

(2000 Agreement.) The "Schedule A" referred to in the 2000 Agreement is an invoice outlining payments due to TDI by CCR. (*See id.* at attached Invoice.) It provides for wages, a service charge, and other employee benefits, including pension benefits. (*See id.*) The 2000 Agreement is governed by Minnesota law. (*See id.* at 1, § 15.)

Ronald Formento explained that "[t]here was nothing in [the 2000 Agreement] that addressed withdrawal liability at the time, because there was no withdrawal

liability." (R. Formento Dep. at 42.) To explain how the 2000 Agreement obligated CCR to pay for the withdrawal liability, he pointed to Sections 4, 5, and 6(e). (*Id.* at 35-36, 48-54.) Jonathan Formento, testifying on behalf of TDI, explained that withdrawal liability was "not outlined, but . . . not excluded" in the 2000 Agreement. (*See* CCR Index at 2, Ex. 6 ("TDI 30(b)(6) Dep.") at 4, 17-19.) When asked what provision governed CCR's obligation to reimburse TDI for withdrawal liability, he did not specify a particular section, but referenced "the section in the contract that identifies benefits . . . and pension." (J. Formento Dep. at 98-99.) Dennis Mulvaney, TDI's Regional Vice President responsible for TDI's operations at CCR's Eagan, Minnesota facility, identified the indemnification clause as the source of CCR's obligation to pay for withdrawal liability. (*See* CCR Index at 2, Ex. 8 ("Mulvaney Dep.") at 5, 10-11, 18-19, 25-26, 44.)

During TDI's business relationship with CCR, TDI entered into four collective bargaining agreements ("CBAs") with the Teamsters Local Union No. 120 (the "Union") covering TDI's mechanics working at a facility in Eagan, Minnesota. (Doc. No. 87 ("J. Formento Aff.") ¶ 25, Ex. I.) When the CBAs were being negotiated, CCR provided input to TDI on various terms. (*See* R. Formento Aff. ¶¶ 32-33, Ex. G; *see also* Doc. No. 95 ("Second Polk Aff.") ¶ 2, Ex. 1("Sypniewski Dep.") at 41; *see also* Mulvaney Dep. at 23-24, 46; CCR Index at 2, Ex. 12 ("Wagner Dep.") at 39-41, 58-62.) Each CBA contained a provision obligating TDI to make ongoing contributions to the Minneapolis Food Distributing Industry Pension Plan (the "Pension Plan"). (*See* J. Formento Aff. ¶ 25, Ex. I.) On April 1, 2001, TDI executed an Employer Participation Agreement with

the Pension Fund's Trustees ("Participation Agreement") which was incorporated into the CBA between TDI and the Union. (R. Formento Aff. ¶ 20, Ex. H.)

TDI employed, paid, and provided W-2s for the individuals providing services on behalf of TDI at CCR's Eagan facility. (CCR Index at 2, Ex. 11, Nos. 7-9.) CCR then reimbursed TDI for invoiced labor costs, including wages, overtime, health benefits, and pension payments. (*See* Wagner Dep. at 32-34.) Ronald Formento claims that TDI and CCR shared an understanding that the 2000 Agreement "contemplated [CCR's] reimbursement of all labor costs including wages and fringe benefits." (R. Formento Aff. ¶ 10.) In particular, he described it as "a pass-through contract" under which all labor costs were invoiced by TDI and paid by CCR. (*Id.* ¶¶ 13, 26; *see also* J. Formento Aff. ¶ 10, Ex. C; R. Formento Dep. at 54-56, 143-46.) Jonathan Formento also described the parties' contract as a "pass-through contract" and explained that costs were passed through to CCR "[i]f agreed upon . . . and understood by both parties." (J. Formento Aff. ¶ 26; TDI 30(b)(6) Dep. at 20-21.) He testified that TDI kept CCR informed of all costs to be assessed. (TDI 30(b)(6) Dep. at 24-25.) Ronald Formento explained that "TDI always considered its withdrawal liability payments to the Fund as contract labor costs required to be reimbursed by Coca-Cola under the 2000 Agreement." (R. Formento Aff. ¶ 44.) In particular, TDI considered withdrawal liability to be the same as the ongoing pension costs which CCR was obligated to pay. (*Id.* ¶¶ 56-57.)

CCR acknowledged that the 2000 Agreement governed, at least initially. (Doc. No. 85 ("Polk Aff.") ¶ 2, Ex. 1, Nos. 1-2.) However, Tom Sypniewski, CCR's Midwest Business Unit Fleet Manager from 2006 to 2012, denied that the parties had a

"pass-through" contract.  (Sypniewski Dep. at 8-9, 35-36.)  Janet Wagner, CCR's Fleet

Supervisor at the Eagan facility, "reviewed [TDI's] invoices to ensure that what [CCR

was] paying were the expressly agreed to amounts for the expressly agreed to items that

[CCR] and TDI had agreed to."  (Wagner Dep. at 14, 101-02; *see also id.* at 105-06.)

## III.     The 2010 Agreement and the Parties' Continued Course of Conduct

On February 10, 2010, Ronald Formento signed an agreement with CCR titled

"Coca-Cola Enterprises Bottling Companies Services Agreement" (the "2010

Agreement").  (R. Formento Aff. ¶ 35, Ex. B ("2010 Agreement").)  Page 1 of the 2010

Agreement includes a recitation of consideration as follows:  "For good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged by the

parties hereto, Coca-Cola Enterprises Inc., its divisions, subsidiaries and affiliates

("Bottler") and <u>TRANSPORT DRIVERS</u> ("Supplier or Contractor") agree . . . ,"  (*Id.* at

1.)  With respect to services and compensation, the 2010 Agreement states:

> 1.      <u>Description of Services and related Equipment</u>
> Contractor shall provide to the Bottler the following services and related
> equipment at the following location:
> EAGAN
> Vehicle maintenance & repairs. . . .
>
> 2.      <u>Compensation</u>
> Contractor shall be compensated by the Bottler for providing the services
> described above on the following basis:
> Accounts payable check, credit card or electronic payment.

(*Id.*)  The Agreement provides that "this Agreement and all Attachments shall constitute

the entire agreement between the parties with regard to the subject matter hereof."  (*Id.*)

The term of the 2010 Agreement is from February 1, 2010 "until all obligations under

[the] Agreement have been performed or . . . until February 1, 2011." (*Id.*) The 2010

Agreement is governed by Georgia law. (*Id.* at Ex. A § 8.)

Exhibit A to the 2010 Agreement consists of several "TERMS AND

CONDITIONS" governing matters such as TDI's insurance, warranty relating to service,

intellectual property rights, and guiding principles CCR requires suppliers to follow.

(2010 Agreement at Ex. A.) An indemnification provision within Exhibit A provides:

> Unless due solely to the negligence of Bottler, Contractor shall defend,
> indemnify and hold harmless Bottler and its affiliates and bottlers from all
> losses including attorneys' fees, incurred by, or claims made against,
> Bottler or any of its affiliates or bottlers as a result of Contractor's breach
> of the representations or warranties in or performance under this
> Agreement. This indemnity shall not limit any other right of indemnity of
> Bottler.

(*Id.* § 4.) Exhibit B to the 2010 Agreement is titled "CONTRACTORS

INDEMNIFICATION AGREEMENT" ("Indemnification Agreement"), and

includes the following provision:

> In consideration of Owner selecting Contractor to perform certain work,
> Contractor hereby agrees to and shall at all times defend, indemnify, release
> and hold Bottler and its subsidiaries, affiliates, officers, agents and
> employees wholly harmless from any and all losses, costs, expenses
> (including court costs and attorneys' fees, interest and profits), claims,
> demands, suits by any person(s), injuries, damages or death and other
> liabilities of whatsoever kind or nature arising out of, resulting from,
> caused by, incident to, or connected with the performance of any and all
> work to be performed for Bottler or with respect to Bottler's property by
> the Contractor, any subcontractor, anyone employed by any of them or
> anyone for whose acts any of them may be liable. This indemnity shall
> survive the termination of this agreement.

(2010 Agreement at Ex. B.) The Indemnification Agreement further provides that:

> In any and all claims against Bottler, its subsidiaries, affiliates, officers,
> agents, or employees by any employee of the Contractor, any

> subcontractor, anyone employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation under this agreement shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Contractor or any subcontractor under Workmen's Compensation Acts, disability benefits acts or other employees benefits acts.

(*Id.*)  Ronald Formento also signed a "vendor service price quote" to accompany the 2010 Agreement.  (*See* R. Formento Aff. ¶¶ 38-40, Exs. C & D.)  This price quote specifies the services provided by TDI, including "Full time assigned mechanics at CCE in E[a]gan[,] MN."  (R. Formento Aff. ¶ 39, Ex. C.)  Rates are identified on the price quote as:  "CBA wages, fringe benefits plus payroll burden and service fee."  (*Id.*)

Although the 2010 Agreement bears Sypniewski's signature, he testified that he did not actually sign it.  (*See* 2010 Agreement; Sypniewski Dep. at 64, 82-83.)  He testified that it was "probably Paulette Brown's signature, who was my office coordinator at the time," and that the person who signed had authority to do so.  (*Id.* at 83, 142.)  CCE entered into "thousands" of agreements similar to the 2010 Agreement with other vendors, including a "couple hundred" within Sypniewski's territory.  (*Id.* at 42-43.)  According to Sypniewski, vendors had the option to propose changes if the terms were unacceptable.  (*Id.* at 75-76, 103-04, 160-61.)  CCR asserts that the 2010 Agreement governed its obligation to pay for TDI's services from approximately October 2, 2010 to April 1, 2013.  (Polk Aff. ¶ 2, Ex. 1, No. 5.)  Sypniewski explained that the price quote referencing "CBA wages, fringe benefits plus payroll burden and service fee" was the portion of the agreement governing payment for services.  (Sypniewski Dep. at 90-92.)

Ronald Formento sought legal counsel to review and negotiate the 2010 Agreement. (R. Formento Dep. at 70-72.) According to Ronald Formento, when he asked Sypniewski what the effect of the 2010 Agreement would be, Sypniewski stated "nothing's changed." (*See* R. Formento Aff. ¶¶ 41-43, 45; *see also* R. Formento Dep. at 71-72, 75.) He explained that Sypniewski told him "we have to return it verbatim; that the company would not tolerate any changes whatsoever." (R. Formento Dep. at 70.) Ronald Formento accepted the 2010 Agreement on TDI's behalf "[u]nder the conditions that I had to sign it or we might lose the business" and based on Sypniewski's assurances that nothing would change. (*See id.* at 72, 77, 105-08.) Sypniewski did not recall speaking with Ronald Formento about the 2010 Agreement. (Sypniewski Dep. at 20, 83.)

Ronald Formento acknowledged the 2010 Agreement as a contract obligating TDI to certain terms. (R. Formento Dep. at 146.) However, his understanding was "that the 2010 papers were an administrative measure requested by CCE to deal with matters such as TDI's insurance coverage" and not matters such as "TDI's collective bargaining agreement (CBA) with the Union or the Pension Fund providing pensions to TDI's mechanics." (R. Formento Aff. ¶¶ 36, 46; *see also* R. Formento Dep. at 97, 147.)

Ronald Formento agreed that "the subject matter of [the 2010 Agreement] was the . . . continued supplying of labor at Eagan by TDI to Coca-Cola." (R. Formento Dep. at 86; *see also id.* at 114.) He contends, however, that "there were no major changes in operations or contractual obligations" from the beginning of TDI's work at the Eagan facility until CCR terminated its services. (R. Formento Aff. ¶ 32; *see also* R. Formento Dep. at 67.) Specifically, no notable changes occurred after the execution of the 2010

Agreement.  (R. Formento Aff. ¶¶ 50, 51.)  Sypniewski and Wagner testified similarly that TDI's services and the invoicing arrangement between the parties stayed the same after the execution of the 2010 Agreement.  (Sypniewski Dep. at 44-45; *see also* Wagner Dep. at 86.)

## IV.    CCR's Termination and CCR's Subsequent Withdrawal Liability

On February 18, 2013, CCR sent a letter to TDI terminating its services effective April 1, 2013.  (J. Formento Aff. ¶ 7, Ex. A.)  On January 3, 2014, counsel for the Minneapolis Food Distributing Industry Pension Plan (the "Fund") sent TDI a demand for payment of withdrawal liability totaling $544,295 based on TDI's complete withdrawal from the Pension Plan.  (J. Formento Aff. ¶ 14, Ex. D.)  According to the Fund, TDI's final contribution was received in March 2013.  (*Id.*)  On March 12, 2014, TDI began making quarterly payments to the Fund.  (J. Formento Aff. ¶ 19, Ex. F.)  As outlined in an October 8, 2014 Settlement Agreement, TDI and the Fund negotiated a settlement of the assessed withdrawal liability, resulting in a reduced total liability of $520,607 and a revised payment schedule.  (J. Formento Aff. ¶ 18, Ex. E.)  CCR did not participate in the withdrawal liability negotiations with TDI.  (CCR Index at 2, Ex. 11, No. 14.)

On November 13, 2015, Jonathan Formento wrote to CCR informing it of the withdrawal liability and seeking reimbursement of $520,607.  (J. Formento Aff. ¶ 22, Ex. G.)  He stated that "[CCR]'s contract with TDI contemplates reimbursement to TDI of such employment-related costs."  (*Id.*)  After CCR failed to respond, Jonathan Formento sent another letter seeking reimbursement on January 11, 2016.  (J. Formento

Aff. ¶ 23, Ex. H.)  Again, CCR did not respond.  (J. Formento Aff. ¶ 24.)  Neither Ronald

nor Jonathan Formento could explain why TDI waited to seek reimbursement of the

withdrawal liability from CCR.  (R. Formento Dep. at 140, 143; J. Formento Dep. at

107.)  Jonathan Formento testified that TDI had verbally notified CCR of the potential for

withdrawal liability, but he could not state with certainty when this occurred or who had

that discussion.  (TDI 30(b)(6) Dep. at 26-29.)

## V.     Expert Testimony and Reports

William Ecklund was engaged by Plaintiff to offer an expert opinion on the

circumstances surrounding TDI's withdrawal liability.  (Polk Aff. ¶ 5, Ex. 4 ("Ecklund

Rep.") at 1.)  Ecklund explains, "by signing a collective bargaining agreement and

agreeing to make contributions to a multiemployer defined benefit plan, the employer

also has a statutory obligation to pay withdrawal liability . . . should that employer

withdraw from a multiemployer pension plan that has unfunded vested benefits."  (*Id.* at

3.)  He opines that "[w]ithdrawal liability payments are treated in the same manner as

regular contributions to a multiemployer pension plan paid pursuant to a collective

bargaining agreement."  (*Id.*)  Ecklund also analyzed the 2000 Agreement[2] and the

assessment of withdrawal liability against TDI following CCR's termination of the

parties' agreement.  (*Id.* at 6-8.)  Ecklund provides eight ultimate opinions.  In particular,

he opines that TDI was bound by the CBA and the Participation Agreement to both make

ongoing contributions and pay withdrawal liability.  (*Id.* at 8.)  In addition, he explains

---

[2]     Ecklund filed a supplement to his report clarifying that he had considered the 2010
Agreement but stating that "[t]his instrument was not within the scope of my engagement
or opinion."  (Doc. No. 85 ("Polk Aff.") ¶ 6, Ex. 5 ("Ecklund Supp. Rep.") at 1.)

that "TDI contributed to the Pension Plan only by reason of its contract with Coca-Cola," and that "[t]he withdrawal liability was attributable solely to the benefits accrued to TDI's [union] employees [at the Eagan facility]." (*Id.* at 10.) He also suggests that the settlement obtained by TDI was "very appropriate." (*Id.* at 9-10.) Finally, Ecklund states his opinion that "TDI's withdrawal liability payments are no different from the other labor costs it was required to pay by reason of its CBA." (*Id.* at 10.)

In his deposition, Ecklund testified that TDI could have possibly avoided being assessed withdrawal liability if it sought to employ its workers with another employer and continued to make contributions to the pension plan. (CCR Index at 2, Ex. 15 ("Ecklund Dep.") at 76-78.) Ecklund also agreed that the statutory liability for withdrawal liability was TDI's alone. (*Id.* at 82, 86-87, 89.) He clarified that his opinion related to a reimbursement obligation to pay the withdrawal liability rather than statutory liability to make such payments. (*Id.* at 90, 123-24, 126-27, 130-31.) Ecklund could not explain in his deposition why his report appeared contrary to an ERISA provision differentiating withdrawal liability and contributions. (*Id.* at 101-02.)

Bernard T. King, CCR's retained expert, was asked to "[p]rovide an opinion in response to the expert report of William K. Ecklund concerning how the withdrawal liability provisions of [ERISA] apply in this case." (CCR Index at 2, Ex. 19 ("King Rep.") at 1-2.) King explains that "Congress carefully limited ERISA employer withdrawal liability to the signatory employer and its control group members." (*Id.* at 3.) Thus, King states, "a leasor of the individuals employed by the signatory is not responsible for withdrawal liability." (*Id.* at 4.) King opines "that [CCR] is clearly not

responsible for TDI's withdrawal liability under ERISA." (*Id.* at 5.) King suggests that "absent an express contractual provision whereby [CCR] specifically assumes responsibility for withdrawal liability, [CCR] is neither a signatory employer nor part of a control group with a withdrawing employer." (*Id.*) King opines that Ecklund's opinion rested on a misunderstanding of the parties' agreements and an erroneous application of relevant ERISA provisions. (*Id.* at 5.) King also suggests that the 2010 Agreement's indemnification provisions establish TDI's obligation to pay the withdrawal liability. (*Id.* at 6.) Finally, King explains that ERISA regulations establish "that TDI could have simply avoided or 'abated' withdrawal liability by resuming contributions to the Pension Plan for another bargaining unit." (*Id.*)

At his deposition, King stated, "I think Ecklund's report tries to mix statutory and contractual obligations." (CCR Index at 3, Ex. 25 ("King Dep.") at 26.) King suggests that "this case is peculiar, because it takes the statutory obligation and tries to turn that into a contractual obligation." (*Id.* at 32-33.) King disputed that withdrawal liability is generally a "labor cost" because it is an obligation imposed by statute. (*See id.* at 64-65.)

## VI. Procedural Background

TDI filed this lawsuit against CCR on April 25, 2016, asserting the following claims: (1) breach of contract (Count I); and (2) promissory estoppel (Count II). (Doc. No. 1 ¶¶ 59-78.) TDI seeks reimbursement of withdrawal liability, including amounts already paid and amounts still owed. (*Id.* at Prayer for Relief.) TDI also seeks attorney fees and costs incurred in settling the withdrawal liability and through this lawsuit. (*Id.*) CCR filed an answer in which it denies any reimbursement obligation and asserts instead

that TDI must indemnify CCR for the withdrawal liability.  (*See* Doc. No. 10 ¶ 58.)  CCR asserts counterclaims against TDI, including:  (1) declaratory judgment (Count I); (2) breach of contract (Count II); and (3) promissory estoppel (Count III).  (*Id.* ¶¶ 102-22.)

On August 9, 2016, CCR filed a Motion for Judgment on the Pleadings, seeking dismissal of TDI's Complaint.  (Doc. No. 20.)  TDI opposed the motion.  (Doc. No. 30.) On May 10, 2017, the Court denied CCR's motion based on disputes between the parties regarding the 2000 and 2010 Agreements and the obligations of the various Coca-Cola entities.  (*See generally* Doc. No. 56.)  The Court noted that it was "hopeful that discovery will lead to greater clarity over the relevance of these competing agreements and the nature of the business relationships between TDI and the relevant Coca-Cola entities."  (*Id.* at 32.)  The parties have since engaged in substantial discovery on these issues, and the parties' cross-motions for summary judgment are ripe for the Court's review.  (*See* Doc. Nos. 82, 88.)  TDI seeks judgment against CCR on all issues, excluding damages.  (Doc. No. 84 at 3.)  CCR seeks dismissal of TDI's claims, judgment in CCR's favor on its breach of contract counterclaim, and an award of damages.  (Doc. No. 90 at 4.)

## DISCUSSION

### I.  Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    The Competing Agreements

The parties vigorously dispute whether the 2000 Agreement or the 2010 Agreement governs their claims in this matter. Thus, the parties argue two underlying issues related to these agreements. First, did the parties enter into an enforceable contract in executing the 2010 Agreement? Second, did the 2010 Agreement supersede and terminate the 2000 Agreement? As the Court explains below, however, it need not address either of these two threshold issues. Even if the 2000 Agreement controls, as TDI argues, it fails to support TDI's position that CCR is obligated to reimburse TDI's

16

withdrawal liability obligations.  And even if the 2010 Agreement controls, as CCR

contends, it does not provide CCR with a right to indemnification for the claims TDI has

asserted in this lawsuit.  Because the terms of the respective agreements fail to support

each party's position, it is immaterial whether the 2000 or 2010 Agreement controls.

## III.    TDI's Claims

### A.    TDI's Breach of Contract Claim

Both parties move for summary judgment with respect to TDI's breach of contract

claim.  Assuming that the 2000 Agreement controls, as TDI argues, Minnesota law

applies to this claim.  Minnesota law upholds freedom of contract principles under which

"parties are generally free to allocate rights, duties, and risks."  *See Lyon Fin. Servs., Inc.*

*v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 545 (Minn. 2014).  "A breach of contract is

a failure, without legal excuse, to perform any promise that forms the whole or part of [a]

contract."  *Id.* at 543.  Under Minnesota law, a breach of contract claim requires a

plaintiff to establish the following elements:  "(1) formation of a contract,

(2) performance by plaintiff of any conditions precedent to his right to demand

performance by the defendant, and (3) breach of the contract by defendant."  *Id.* (quoting

*Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)).

When a court is called upon to interpret a contract, its "primary goal . . . is to

determine and enforce the intent of the parties."  *Loftness Specialized Farm Equip., Inc.*

*v. Twiestmeyer*, 818 F.3d 356, 361 (8th Cir. 2016) (quoting *Motorsports Racing Plus, Inc.*

*v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)).  If the parties' intent is

unambiguously expressed, the contract's terms must "be given their plain and ordinary

17

meaning." *Id.* (citation omitted). In addition, a court should "construe a contract as a whole and attempt to harmonize all of its clauses." *Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016). "The interpretation of an unambiguous contract presents a question of law." *Gorog v. Best Buy Co.*, 760 F.3d 787, 793 (8th Cir. 2014).

To support its claims, TDI relies on "provisions of the 2000 Agreement requiring [CCR] to reimburse TDI for its labor costs and to allow TDI to recover its costs in enforcing its remedies." (Doc. No. 84 at 17.) According to TDI, "[f]rom 'day one,' everyone understood" that the 2000 Agreement was a "pass-through contract." (*Id.*) TDI points to Sections 2(b) and 2(c) of the 2000 Agreement as the basis for TDI's obligations "to pay all labor costs and administer the CBA." (*Id.*) TDI argues that Section 3 required CCR to reimburse TDI for these costs based on invoices submitted. Pointing to Section 4, TDI asserts that "[t]he entire arrangement was based on the CBA." (*Id.*) In TDI's view, Sections 1 and 4 of the Agreement establish the nature of services to be leased to CCR and "that the cost for those services would be dictated by TDI's CBA."[3] (*Id.* at 20.)

TDI emphasizes that it is not relevant "[t]hat the words 'withdrawal liability' were not used in the 2000 Agreement" because "[t]he actual conduct of [CCR] over 12 years paying pension shows that it agreed to the pensions." (*Id.* at 24.) TDI argues that CCR's conduct illustrates "what [CCR] considered its obligation to be with respect to the mechanics' pension benefits and the payments for those labor costs under the CBA." (*Id.*

---

[3] TDI also identifies Sections 5 and 6(e) as relevant indemnification provisions within the 2000 Agreement, along with Section 8 which provides for attorney fees in enforcing the agreement.

at 21.)  According to TDI, "[t]he act of agreeing to pay for the mechanics' pensions—repeatedly over twelve years—was nothing less than agreeing to *all* aspects of their pensions."  (*Id.* at 22.)  TDI relies on Ecklund's opinion to argue that "the nature of withdrawal liability is the same as regular on-going contributions."  (*Id.*)  TDI contends that CCR failed to carve out withdrawal liability obligations in agreeing to pay for labor costs and pensions.  Ultimately, TDI asserts that "[i]n a nutshell, the operative requirement under the 2000 Agreement was bona fide labor costs, including pension costs."  (Doc. No. 94 at 25.)

Although CCR asserts that the 2010 Agreement superseded the 2000 Agreement,[4] it contends that it would still be entitled to summary judgment "[e]ven if the 2010 Agreement were invalid, or did not completely supersede the 2000 Agreement and the two agreements must be read together."  (Doc. No. 90 at 26.)  This is so, CCR argues, because no provisions in the 2000 Agreement provide for CCR's obligation to pay the withdrawal liability.  In particular, CCR disputes that Sections 2(b), 2(c), and 3 "establish that every expense and liability incurred by TDI was off-loaded to CCR."  (Doc. No. 96 at 29.)  CCR also contends that Section 4—relating to violations of the CBA—does not

---

[4]     Consistent with its argument that the 2010 Agreement superseded the 2000 Agreement, CCR argues that the 2010 Agreement also lacks any provisions to support TDI's claimed entitlement to reimbursement for the withdrawal liability.  CCR points out that "[i]t is undisputed that TDI as the employer and signatory to the CBAs and Plan Participation Agreement, and not CCR, is statutorily liable for the withdrawal liability at issue here."  (Doc. No. 90 at 24.)  Because the 2010 Agreement does not contain any language assuming this liability, CCR argues, it cannot now be held responsible for it.

apply here because CCR did not cause TDI to violate a CBA.[5]  CCR also disputes that

the obligation to reimburse TDI for the withdrawal liability arises from its agreement to

make ongoing pension plan contributions, emphasizing that "[m]onthly contributions to

[a] pension plan under a CBA are categorically different than withdrawal liability."  (*Id.*)

To support this assertion, CCR points to ERISA statutory provisions and caselaw

highlighting the distinct nature of ongoing contributions and withdrawal liability.

     Although TDI's breach of contract claim does not arise under ERISA, a

background understanding of ERISA withdrawal liability is instructive for understanding

the parties' respective positions and interpreting the 2000 Agreement.  Withdrawal

liability arises from provisions in ERISA Title IV, enacted in the Multiemployer Pension

Plan Amendments Act of 1980 ("MPPAA").  *See Seaway Port Auth. of Duluth v.*

*Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503, 505 (8th Cir.

1990).  "The concept of withdrawal liability attempts to avoid a situation in which the

financial burden of funding vested pension benefits is shifted onto other employers

participating in the multiemployer plan and, ultimately, to the Pension Benefit Guaranty

Corporation."  *Transpersonnel, Inc. v. Roadway Express, Inc.*, 422 F.3d 456, 460 (7th

Cir. 2005).  The Eighth Circuit has noted this useful explanation:

> The MPPAA establishes withdrawal liability for employers that cease
> participation in a multiemployer pension plan, as well as means for
> computing that liability.  Complete withdrawal from a multiemployer
> pension plan occurs when an employer either permanently ceases to have
> an obligation to contribute under the plan or permanently ceases all

---

[5]    CCR also argues that Sections 5 and 6—covering compliance with federal
regulations and indemnification—are "clearly inapplicable" in this matter.  (Doc. No. 90
at 27.)

operations covered under the plan. . . . At the time that an employer withdraws from a plan, the plan is required by the MPPAA to determine the amount of the employer's withdrawal liability, and notify the employer of that amount.

*Seaway*, 920 F.2d at 505-06 (quoting *Connors v. B.M.C. Coal Co.*, 634 F. Supp. 74, 75 (D.D.C. 1986)).  ERISA imposes statutory withdrawal liability as follows:  "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."  29 U.S.C. § 1381(a).  ERISA also provides that "[p]ayments of withdrawal liability under this part shall not be considered contributions for purposes of this part."  29 U.S.C. § 1392(b).

The Circuit Courts of Appeal have established guidelines to determine whether an entity qualifies as an "employer" for purposes of assessing withdrawal liability.  *See, e.g.*, *Rheem Mfg. Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 63 F.3d 703, 706 (8th Cir. 1995).  The Eighth Circuit, for example, has clarified that "the party who is signatory to a contract creating the obligation to contribute is the 'employer' for purposes of establishing withdrawal liability."  *Id.* at 707.  In *Rheem*, the Eighth Circuit confronted analogous circumstances to this case and held that a lessee of truck drivers was not an "employer" under ERISA because "Knight [the lessor], and not Rheem [the lessee], was contractually bound to make pension contributions to [the pension fund]."  *See id.* at 704, 707.  Relying on *Rheem*, the Seventh Circuit has similarly held that a lessee of truck drivers was not an "employer" for withdrawal liability purposes, even where the lessee had contractually agreed to reimburse the lessor "for all applicable employee benefits,

including . . . pension fund contributions." *See Transpersonnel*, 422 F.3d at 458, 462. The court explained that "the obligation to *reimburse* for contributions made by another is not the equivalent of an obligation to *contribute* in the first instance." *Id.* at 461. The Court evaluates the obligations imposed under the 2000 Agreement with these relevant authorities in mind.

The Court concludes that CCR is entitled to summary judgment on TDI's breach of contract claim. TDI has failed to establish that the 2000 Agreement obligates CCR to reimburse TDI for the withdrawal liability at issue. In particular, the Court finds that neither Section 2 nor Section 3 establishes the "pass-through contract" that TDI now alleges governed the parties' relationship. Section 2 provides for TDI's payment of wages and benefits along with the administration of any CBAs. (*See* 2000 Agreement §§ 2(b)-(c).) Section 3, the portion of the 2000 Agreement that most clearly relates to CCR's reimbursement obligations, simply states that "[TDI] will invoice [CCR] each week for all charges payable for that week as described in the Schedules A, and for all other charges provided for in this Agreement. . . ." (*Id.* § 4.) Perhaps most relevant for TDI's claim, the attached invoice which the parties treated as the "Schedule A" referenced above has a line-item including "PENSION" costs. (*See id.* at Invoice.)

Based on the nature of statutory withdrawal liability obligations under ERISA, however, even if CCR had agreed to reimburse TDI for ongoing pension contributions, this would not amount to a contractual obligation to reimburse TDI for any withdrawal liability assessed. As outlined in the persuasive caselaw discussed above, a lessor may not be assessed withdrawal liability absent an express contractual provision under which

22

it assumes an obligation to contribute to the pension fund. *See Transpersonnel*, 422 F.3d at 461-62; *Rheem*, 63 F.3d at 707. Even a reimbursement obligation with respect to ongoing contributions would not support the imposition of statutory liability against a lessor. *See Transpersonnel*, 422 F.3d at 461 ("[T]he obligation to *reimburse* for contributions made by another is not the equivalent of an obligation to *contribute* in the first instance."). Relatedly, the Court concludes that even if CCR had an obligation to reimburse TDI for its ongoing pension costs, this would not create a contractual reimbursement obligation for withdrawal liability absent an express agreement with respect to this particular cost.

There is no dispute that TDI, and not CCR, was the signatory to the CBAs and the Participation Agreement which established the obligation to contribute to the pension fund. If TDI wished to ensure that potential withdrawal liability would be reimbursed by CCR, it was incumbent on TDI to establish an express agreement. Neither the Court nor a jury could impose such an obligation based on TDI's mere hope or belief that such costs would be repaid. In sum, the Court finds that there is no genuine issue of fact in dispute relating to TDI's breach of contract claim as there is no basis upon which a jury could find CCR obligated to reimburse TDI for the withdrawal liability it has incurred.

### B.    TDI's Promissory Estoppel Claim

Both parties also move for summary judgment on TDI's alternative claim for promissory estoppel. "Promissory estoppel is a creature of equity which implies 'a contract in law where none exist in fact.'" *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn. 1995) (quoting *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d

114, 116 (Minn. 1981)). "To state a claim for promissory estoppel, the plaintiff must show that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 834 (Minn. 2011). The plaintiff's reliance on the alleged promise must be reasonable. *See Barker v. Cty. of Lyon*, 813 N.W.2d 424, 426 (Minn. Ct. App. 2012). Reliance may be deemed unreasonable as a matter of law where a written contract directly contradicts the alleged promise. *See BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 903 (Minn. Ct. App. 2010).

TDI argues that if its breach of contract claim fails, it must prevail on its promissory estoppel claim. First, TDI contends that the Court has already determined that the 2000 Agreement establishes a clear and definite promise. TDI also contends that "CCR's words and deeds were a clear and definite promise." (Doc. No. 94 at 28.) Second, TDI argues that CCR sought to induce TDI's performance and that TDI's reliance on the alleged promise was reasonable. Finally, TDI argues that CCR's promise must be enforced to avoid injustice, asserting that "the injustice that would occur if CCR were not required to pay the pension bill is obvious." (Doc. No. 84 at 40.)

CCR contends that TDI's promissory estoppel claim fails because the parties' indemnification responsibilities are expressly covered by the 2010 Agreement. Furthermore, CCR argues that TDI fails to establish any of the elements to support its promissory estoppel claim. First, CCR argues there is no evidence of a clear and definite promise by CCR to pay TDI's withdrawal liability. In particular, CCR contends, the

2000 Agreement does not establish the requisite clear and definite promise because it was superseded by the 2010 Agreement and its terms do not require that CCR pay for withdrawal liability.[6] CCR also disputes TDI's contention that "CCR intended to induce TDI's reliance because CCR needed TDI to keep its trucks running," arguing that no facts support this proposition. (Doc. No. 106 at 9 (quoting Doc No. 94 at 28).) Second, CCR argues that any reliance by TDI on the alleged promise to pay withdrawal liability was not reasonable. Finally, CCR disputes that any alleged promise must be enforced to prevent injustice, contending that "[n]o manifest injustice results from requiring TDI to pay withdrawal liability that it is statutorily and contractually obligated to pay." (Doc. No. 90 at 33.) With respect to this element, CCR emphasizes that TDI is a sophisticated company experienced with withdrawal liability and contract negotiations.

The Court concludes that CCR is entitled to summary judgment on TDI's promissory estoppel claim. Even viewing that facts in the light most favorable to TDI, neither the terms of the 2000 Agreement nor CCR's conduct support a reasonable inference that CCR made a clear and definite promise to reimburse TDI for withdrawal liability.[7] Furthermore, even if such a promise had been made, the Court finds that TDI

---

[6]     CCR acknowledges that the Court previously held that TDI had adequately pled the existence of a clear and definite promise to survive CCR's Motion for Judgment on the Pleadings. However, CCR argues, "in light of discovery on these issues, it is now abundantly clear that TDI cannot *prove* this element." (Doc. No. 96 at 34.)

[7]     At this stage, the Court is not bound by its prior determination that TDI had adequately pled the existence of a clear and definite promise based on the 2000 Agreement's terms to survive CCR's Motion for Judgment on the Pleadings. (*See* Doc. No. 56 at 31.) In light of the complete record and present posture of the case, the Court is

has failed to present facts to establish the third element of its promissory estoppel claim—that any alleged promise must be enforced to prevent injustice. The record undisputedly establishes that Ronald Formento was an experienced businessman familiar with the concept of withdrawal liability. He was also free to obtain the advice of counsel in negotiating the parties' agreements. In the absence of an express agreement between the parties that CCR would reimburse TDI for withdrawal liability costs, the Court concludes that failure to enforce any alleged promise would not produce an unjust result. Thus, because the record fails to support the essential elements of TDI's promissory estoppel claim, CCR is entitled to summary judgment on this claim.

## IV. CCR's Counterclaims

### A. CCR's Breach of Contract Counterclaim

The parties both seek summary judgment on CCR's counterclaim for TDI's alleged breach of the 2010 Agreement. Assuming the 2010 Agreement is valid and enforceable, the Court will analyze this claim under Georgia law. "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Dewrell Sacks, LLP v. Chi. Title Ins. Co.*, 749 S.E.2d 802, 806 (Ga. Ct. App. 2013) (citation omitted). Georgia courts engage in a three-step process in construing a contract:

> At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some

persuaded that the terms of the 2000 Agreement fail to support a reasonable finding of a clear and definite promise by CCR to reimburse TDI for withdrawal liability incurred.

respect, the court must apply the rules of contract construction to resolve the ambiguity.  Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.  The existence or nonexistence of an ambiguity is a question of law for the court.  If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of construction in OCGA § 13-2-2.

*Envision Printing, LLC v. Evans*, 786 S.E.2d 250, 252 (Ga. Ct. App. 2016) (quoting *Gen.*

*Steel v. Delta Bldg. Sys.*, 676 S.E.2d 451, 453 (Ga. Ct. App. 2009)).

In conducting the first step of this analysis, the court must "look to the four

corners of the instrument to determine the intention of the parties from the language

employed."  *Livoti v. Aycock*, 590 S.E.2d 159, 164 (Ga. Ct. App. 2003).  At this stage,

"all the attendant and surrounding circumstances may be proved but not explained."  *See*

*id.*; *see also* Ga. Code Ann. § 13-2-2(1) (2018).  A court should consider "the whole

contract . . . in arriving at the construction of any part."  Ga. Code Ann. § 13-2-2(4).

Ambiguity exists if the contract contains "duplicity, indistinctness or an uncertainty of

meaning or expression."  *Young v. Stump*, 669 S.E.2d 148, 150 (Ga. Ct. App. 2008)

(quoting *Horwitz v. Weil*, 569 S.E.2d 515, 516 (Ga. 2002)).  The court's aim should be to

"give a reasonable, lawful and effective meaning to all manifestations of intention by the

parties rather than an interpretation which leaves a part of such manifestations

unreasonable or of no effect."  *Id.* (citation omitted).  However, "no construction is

required or even permitted when the language employed by the parties in the contract is

plain, unambiguous, and capable of only one reasonable interpretation."  *Megel v.*

*Donaldson*, 654 S.E.2d 656, 660 (Ga. Ct. App. 2007) (citation omitted).  If the court

determines an ambiguity exists, the contract "will be construed against the preparer and in favor of the non-preparer." *See Envision Printing*, 786 S.E.2d at 253; *see also* Ga. Code Ann. § 13-2-2(5) ("If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred.").

Turning to the interpretation of an indemnification provision in particular, "Georgia law defines indemnity as the obligation or duty resting on one person to make good any loss or damage another has incurred by acting at his request or for his benefit." *PIC Grp., Inc. v. LandCoast Insulation, Inc.*, 795 F. Supp. 2d 459, 463 n.2 (S.D. Miss. 2011) (quoting *Lanier at McEver, L.P. v. Planners & Eng'rs Collaborative, Inc.*, 663 S.E.2d 240, 242 (Ga. 2008)). In the indemnification context, Georgia courts construe the phrase "arising out of" broadly; indeed, "[a]lmost any causal connection or relationship will do." *JNJ Found. Specialists, Inc. v. D.R. Horton, Inc.*, 717 S.E.2d 219, 222 (Ga. Ct. App. 2011) (citation omitted). However, "the scope of a written indemnification contract is a question of law for the court, which must strictly construe the contract against the indemnitee." *SRG Consulting, Inc. v. Eagle Hosp. Physicians, LLC*, 640 S.E.2d 306, 308-09 (Ga. Ct. App. 2006) (alteration and citation omitted). In addition, "every presumption is against such intention [to indemnify]." *Serv. Merch. Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 237-38 (Ga. Ct. App. 2005) (citation omitted). The Georgia Court of Appeals has noted that "the purpose of an indemnity clause in a contract is not to protect the parties to the contract from legal action by each other to enforce the contract." *SRG Consulting, Inc.*, 640 S.E.2d at 309.

CCR argues that the 2010 Agreement's termination clause and indemnity provisions clearly establish that TDI must indemnify CCR for the withdrawal liability at issue. In particular, CCR argues that "the controlling 2010 Agreement expressly provides that TDI will release, hold harmless, defend, and indemnify CCR . . . from any and all claims and liabilities 'arising out of, resulting from, caused by, incident to, or connected with the performance of any and all work to be performed' for CCR by TDI." (Doc. No. 90 at 34 (quoting 2000 Agreement at Ex. B).) Thus, CCR contends that TDI has breached the 2010 Agreement by initiating this lawsuit, and CCR seeks damages in the form of attorney fees and costs.

TDI argues that CCR's claimed right to indemnification in this lawsuit rests on an untenable interpretation of the 2010 Agreement. TDI disputes that the language of the 2010 Agreement's indemnification clause covers the circumstances at issue here. In particular, TDI suggests that "if CCR's all-encompassing interpretation of the indemnification clause were correct, then TDI could never even bring an action for reimbursement of its regular labor costs . . . without paying CCR for its costs in litigation over CCR's wrongful conduct." (Doc. No. 84 at 36.) TDI also argues that the indemnification clause's reference to "Owner" is uncertain. TDI makes a series of arguments regarding CCR's apparent interpretation of the 2010 Agreement's indemnification clause, arguing that it is absurd; unconscionable; contrary to canons of construction against the drafter of a form document, adhesion contract, or an indemnity contract; evidence of a lack of good faith; and tantamount to form of forfeiture.

The Court finds that TDI is entitled to summary judgment with respect to CCR's counterclaim for breach of contract based on the Indemnification Agreement. CCR's counterclaim is subject to dismissal because, even if the 2010 Agreement is enforceable and governs the parties' relationship, its terms fail to support a right to indemnification in this case under Georgia law. The Indemnification Agreement states, in relevant part:

> Contractor hereby agrees to and shall at all times defend, indemnify, release and hold Bottler . . . wholly harmless from any and all . . . claims, demands, suits by any person(s), . . . and other liabilities of whatsoever kind or nature arising out of, resulting from, caused by, incident to, or connected with the performance of any and all work to be performed for Bottler or with respect to Bottler's property by the Contractor . . . .[8]

(2010 Agreement at Ex. B.) CCR's argument in favor of indemnity can be framed in one of two ways. CCR may be entitled to indemnification because TDI's lawsuit is a "suit[] by any person(s) . . . arising out of" TDI's performance for CCR. (*See* 2010 Agreement at Ex. B.) Alternatively, CCR may be entitled to indemnification because the Fund's assessment of withdrawal liability is a "demand[] . . . [or] other liabilit[y] of whatsoever kind or nature arising out of" TDI's work, and TDI has failed to "defend, indemnify, release and hold [CCR] . . . wholly harmless from" this liability. (*See id.*)

The first scenario presents the ambiguity of whether the agreement's reference to "suits by any persons(s)" applies to suits against CCR brought by TDI itself. The Indemnification Agreement repeatedly uses the term "Contractor" in reference to TDI and yet omits any reference to "suits by the Contractor." At the same time, "any

---

[8] CCR also points to other provisions in the 2010 Agreement such as the indemnification clause in Exhibit A and the language in Exhibit B referencing "employees benefits acts." The Court is not persuaded, however, that any other provisions in the 2010 Agreement support CCR's counterclaim.

person(s)" could extend to cover the Contractor as well. Recognizing that "the purpose of an indemnity clause in a contract is not to protect the parties to the contract from legal action by each other to enforce the contract," *SRG Consulting, Inc.*, 640 S.E.2d at 309, the Court resolves this ambiguity against indemnification.

The second scenario raises ambiguity over whether the Indemnification Agreement's terms extend to the circumstances at issue here in which TDI seeks reimbursement for its own withdrawal liability under ERISA prompted by the Fund's demand. Again, the Court shall resolve this ambiguity against indemnification. Notably, this is not a case in which TDI has denied its primary obligation to pay the withdrawal liability to the Fund under the Participation Agreement and the CBAs. *See Transpersonnel, Inc.*, 422 F.3d at 459. Nor does this case involve the Fund pursing a direct claim against CCR for the withdrawal liability. *See Rheem*, 63 F.3d at 705. The indemnification issue would present a closer question if this case arose from such circumstances. Here, however, TDI acknowledges its statutory withdrawal liability to the Fund, independently negotiated a settlement with the Fund, and now seeks reimbursement from CCR pursuant to an alleged contractual obligation. TDI does not claim that CCR is statutorily liable for the withdrawal liability or seek to transfer its own liability to CCR. Thus, under Georgia law and construing the agreement strictly against indemnification, *see SRG Consulting, Inc.*, 640 S.E.2d at 308-09, the Court concludes that the Indemnification Agreement does not extend to such circumstances.

## B.      CCR's Promissory Estoppel Counterclaim

TDI moves for summary judgment on CCR's promissory estoppel counterclaim. Neither party squarely addresses which law governs this claim. However, the Court does not find there to be a material conflict between Minnesota and Georgia law, and the application of either state's law would support the same result.

Under Georgia law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  Ga. Code Ann. § 13-3-44(a) (2018).  Georgia law requires proof of the following elements to establish a claim of promissory estoppel: "(1) defendant made certain promises, (2) defendant should have expected that plaintiffs would rely on such promises, (3) the plaintiffs did in fact rely on such promises to their detriment, and (4) injustice can be avoided only by enforcement of the promise."  *Sparra v. Deutsche Bank Nat'l Tr. Co.*, 785 S.E.2d 78, 83 (Ga. Ct. App. 2016) (citation omitted). A plaintiff may not rely on a promise "which is too vague and indefinite."  *See id.*  As noted above, Minnesota law similarly requires "that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice."  *Park Nicollet Clinic*, 808 N.W.2d at 834.

TDI argues that CCR has not identified facts to support any of the requisite elements of its promissory estoppel claim.  CCR argues that "if the 2010 Agreement is somehow deemed ineffective, there is ample evidence establishing the elements of

promissory estoppel." (Doc. No. 96 at 36-37.)  In particular, CCR asserts that TDI made a "clear promise to hold harmless and indemnify CCR for the claims it has brought in this litigation" by executing the 2010 Agreement.  (*See id.* at 37-38.)

Consistent with the Court's construction of the Indemnification Agreement, above, the Court concludes that the terms of the 2010 Agreement fail to support the requisite element of a clear and definite promise.  The Indemnification Agreement is ambiguous regarding its application to the claims TDI has raised in this case, and a reasonable jury could not conclude that TDI's execution of the 2010 Agreement constituted a clear promise not to assert such claims.  Thus, TDI is entitled to summary judgment on CCR's promissory estoppel counterclaim.

### C.     CCR's Declaratory Judgment Counterclaim

Finally, TDI asserts that "since CCR's state law claims fail, so too does its request for declaratory judgment." (Doc. No. 84 at 41.)  CCR did not specifically address this claim in reply.  CCR "seeks a declaration from this Court that by virtue of entering into the 2010 Services Agreement, the parties terminated the 1985 Agreement." (*See* Doc. No. 10 ¶ 111.)  CCR also seeks a declaration that, under the 2010 Agreement, "TDI is wholly responsible for any and all amounts assessed against it for any alleged withdrawal (or any other) liability arising from the termination of its contracts with CCR, including any amounts that CCR might be liable for under ERISA as alleged in TDI's Complaint." (*Id.* at Prayer for Relief.)  The Court has determined that summary judgment against CCR is warranted with respect to CCR's breach of contract and promissory estoppel

counterclaims even assuming that the 2010 Agreement governs.  Thus, the Court concludes that CCR's counterclaim for declaratory judgment is moot.

**ORDER**

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. [82]) is **GRANTED IN PART**, consistent with the Court's order.

2.      Defendant's Motion for Summary Judgment (Doc. No. [88]) is **GRANTED IN PART**, consistent with the Court's order.

3.      Plaintiff's claims for breach of contract (Count I) and promissory estoppel (Count II) are **DISMISSED WITH PREJUDICE**.

4.      Defendant's counterclaims for declaratory judgment (Count I), breach of contract (Count II), and promissory estoppel (Count III) are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 2, 2018                         s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge